of an undertaking pursuant to section 1671 of the Code of Civil Procedure. Tishman v. Acritelli, 111 App. Div. 237, 97 N. Y. Supp. 668; Schenkein v. Horowitz (June 9, 1906) 99 N. Y. Supp. 161.

It is urged by the defendant, however, that specific performance by him is impossible, and that adequate relief can be secured to the plaintiff by a deposit of money or the giving of security, as was done in Bresel v. Browning, 109 App. Div. 588, 96 N. Y. Supp. 402. But that case has no application, since it there appeared by the complaint that the only relief which the plaintiff could obtain was a judgment for a sum of money, while here the plaintiff claims that the defects upon which the rejection of title was based can be cured by the defendant. The test in applications of this character is, not what may be the ultimate outcome of the case at the trial, but what is demanded in the complaint. As was said in Tishman v. Acritelli, supra (at page 239 of 111 App. Div., and page 670 of 97 N. Y. Supp.) :

"The right of the plaintiff to retain the notice of pendency of action must be determined upon the allegations of the complaint or facts clearly established."

The right of the plaintiff to retain the lis pendens should not be determined in advance of the trial.

Motion denied, with $10 costs to the plaintiff to abide the event.

---

### HOWARD IRON WORKS v. BUFFALO ELEVATING CO.

(Supreme Court, Appellate Division, Fourth Department. May 9, 1906.

1. SALES—MACHINERY—ACTION FOR PRICE—COUNTERCLAIM—INHERENT DEFECTS.
    In an action for the price of machinery sold for a movable grain tower, on a counterclaim for its destruction in a gale, evidence *held* to require a finding that the accident was due to the inherent weakness of a spur wheel used in moving the tower, and not to the force of the gale, either alone or in connection with the fact that the cable attached to the tower had been permitted to slack.

2. SAME—INHERENT DEFECTS—CONDITION OF SUITABLENESS.
    Where defendant's superintendent prepared plans and specifications for machinery connected with a movable grain tower, and plaintiff contracted to manufacture and furnish such machinery, with certain exceptions, including a spur wheel, which it agreed to purchase from another manufacturer, and which it did purchase in the rough, and furnished to defendant as a part of the machinery, there was no implied condition in the executory contract for the sale of such machinery that the wheel was free from concealed defects, which occurred in the process of manufature, and which could have been discovered only by destruction of the wheel.
    [Ed. Note.—For cases in point, see vol. 43, Cent. Dig. Sales, § 776.]

Appeal from Erie County Court.

Actions by the Howard Iron Works against the Buffalo Elevating Company. From a judgment for plaintiff, defendant appeals. Affirmed.

See 81 N. Y. Supp. 452.

The opinion of Referee Charles J. Bissell is as follows:

Both of these actions were commenced in the County Court of Erie county by the plaintiff, a manufacturing corporation doing business at Buffalo, N. Y.,

against the defendant, a corporation engaged in the elevating of grain and the owner of a large elevator, known as the "Dakota Elevator," situate in the Buffalo harbor. In the year 1900 the defendant was engaged in repairing extensively its elevator, and had let the contract to the plaintiff to furnish certain machinery to be used in the interior of the elevator building proper. The defendant in and prior to the month of May, 1901, had let the contract to the American Bridge Company for the construction of two movable towers, which were to be used in connection with the elevator proper. These towers moved upon a dock in front of the elevator building and between it and the Buffalo harbor, were constructed of iron, and were about 34 feet in length, running parallel with the face of the elevator, about 21 or 23 feet in width, and 145 feet in height, and weighed about 214 tons. The two tracks upon which these elevators moved back and forth upon the docks were ordinary railroad tracks, the ordinary gauge and the ordinary distance between. Each of the towers rested upon 32 car wheels, 16 resting upon each of the two tracks. Each of the towers, the fronts of which were close and almost flush with the surface of the dock, contained a leg of iron, which was let down into the hold of the vessel, and the grain, by means of carriers operating in the legs, was elevated from the hold of the vessel, carried up to the top of the tower and into the bin in the elevator proper, opposite the towers. The purpose of having the elevators movable was to facilitate the unloading of vessels and storing of grain, so that the tower, as fast as one bin in the elevator was filled, could be moved along to the next bin. The towers were to be moved by certain machinery, operated by a dynamo, the whole placed within the body of the towers. The two cables, of great strength, were wound about a drum in the tower, each cable extending in an opposite direction, and fastened near each end of the dock in front of the elevator to a very strong post. The machinery in the towers caused the drum about which the cables were wound to revolve either backward or forward. The drum was revolved by means of power applied through a series of shafts and wheels to a large wheel, known as a "spur wheel." This wheel was attached firmly to the shaft, which was also attached to the drum, and the shafts were keyed by a steel key to both the drum and the spur wheel, so that when the spur wheel was caused to revolve by reason of the power applied to the teeth in its outer rim, the drum revolved either backward or forward, winding up the cable on the drum on one side, and playing out the cable from the drum on the other side. The defendant employed a competent millwright and mechanic named Brown to make a plan of and designs for the machinery to be placed in the tower, including the spur wheel. The plans drawn by Brown showed the size of all the shafts, the drum, the different wheels, showed the number of teeth, and the pitch of the teeth, but did not show the thickness or weight of the various parts. By direction of the defendant, Brown applied to the plaintiff's general manager to make with it a contract for the manufacture and delivery of the various parts of the machinery specified upon the plan, which was produced, and shown to the plaintiff's agent. The plaintiff's agent stated that it could make all of the machinery excepting the spur and the pinion wheels. It had no patterns for such wheels and it would cost from $75 to $100 extra to make the patterns. The defendant's agent stated that the defendant did not wish to pay for patterns. and some talk was had as to where the wheels could be procured cheaper than the patterns could be made and the wheels manufactured by the plaintiff. The names of several manufacturers were given to the defendant's agent by plaintiff's superintendent, and finally the defendant's agent directed the superintendent to get the wheels where he pleased; that he wanted them where they could be obtained the cheapest for a good article, and did not wish to pay anything extra for patterns. At the time of the contract, both the agents of the plaintiff and of the defendant knew the purpose for which the machinery was designed and what it was expected to do, and knew in a general way the size of the towers that it was expected to move and control, and the place where the towers were located, and in a general way the velocity of the windstorms which might be expected to occur in the Buffalo harbor from time to time. The plaintiff manufactured all the machinery ordered, excepting the spur and pinion wheels, which it ordered from the Gleason Company, reputable manufacturers, doing business in the city

of Rochester, N. Y.  The wheels were ordered in the rough; that is, a core was to be left through the center of the hub, which was afterwards to be bored out, and the dimensions of the wheels, pitch of teeth, number of teeth, and general size were as specified in the plan prepared by Brown, but the thickness of the different parts of the wheels was left to the determination of the plaintiff and the Gleason Company.  The wheels were manufactured by the Gleason Company in accordance with the plans, and were of the proper weight, and the thickness of the parts was proper and in accord with the size of the wheels as given upon the plan.  After the spur wheels were delivered, the plaintiff caused the core of the spur wheels to be bored out, so that the shaft might be accurately fitted, and caused a keyway to be planed out on the inside of the circumference of the core.  The shaft was correspondingly keyed by the plaintiff, and all of the machinery, including the steel key, delivered to the defendant, and the defendant installed the machinery in the tower No. 1, procured its cables, and attached them properly to the drum, and put the tower in commission on the 14th of April, 1902, and operated it almost continuously without any difficulty or accident until the afternoon of the 3d day of May, 1902.  On the night of the 6th of May, between which time and May 3d the tower had not been operated, the tower having been left for the night with the cables taut, a heavy windstorm arose, blowing at the rate of from 48 to 60 miles an hour, a velocity which it attained at about 10:50 o'clock, p. m., of May 6th.  The force exerted by the wind against the tower was such as to burst the spur wheel of tower No. 1 by a fracture straight across through the center of the hub.  All resistance to the movement of the tower was thereby removed, and by force of the wind it was driven along the dock until the cable entirely unwound, when by the momentum which the tower had obtained the cable snapped, the tower struck the northwest post to which the cable was attached, and toppled over into the creek, and the defendant promptly notified the plaintiff of the accident, and requested it to remove or repair the tower, which it refused to do.  The defendant thereupon raised the tower and repaired it, incurring an expense of many thousands of dollars.

Two actions were brought by the plaintiff against the defendant, one to recover for a balance due upon the purchase price of the machinery that went into the movable towers, and which action is known as action No. 1, and another action to recover a balance claimed to be due for machinery furnished and labor performed in the elevator proper, which action is known as action No. 2.  In both of these actions the defendant set up the same counterclaim.  Upon the trial it was stipulated that in action No. 2, there was a certain amount due and unpaid to the plaintiff, and that the referee might direct judgment for that amount, without costs, in favor of the plaintiff, without prejudice to the defendant's counterclaim set up in action No. 1; the purpose being to try out the question of the counterclaim in the one action—action No. 1 Accordingly, a report in action No. 2 has been made by the referee, directing judgment for the amount agreed upon, without prejudice to the counterclaim.

It appeared upon the trial, as shown in the findings of fact, that the spur wheel broke solely by reason of the large interior flaw or blowhole in one side of the hub, which was not discoverable by either the plaintiff or the defendant by the application of any known test short of the destruction of the wheel itself; that this weakness, occasioned by the flaw, was intensified owing to the fact that the keyway, which was made by chiseling out a quantity of iron on the inner circumference of the core, was located directly opposite to and in line with the flaw, and the evidence showed that the spur wheel broke on a direct line from the keyway, across through the center of the flaw.  At the time of the making of the contract for this machinery, it appears that Brown suggested to the plaintiff's superintendent that the spur wheels ought to have palms and arms cast in to strengthen; these palms and arms not being shown upon the plan.  There followed some discussion and a reference to other towers which were being operated in the Buffalo harbor, some of which had larger wheels for towers of the same weight, and some of which had smaller spur wheels for towers of greater weight, and it was finally agreed, both by the plaintiff's agent and the defendant's agent, that the palms and arms should be dispensed with; both

agreeing that the wheel, as designed, would be strong enough for all purpose. There was clearly no express warranty upon the part of the plaintiff that the machinery would in any respect when furnished be fit for the purposes for which it was ordered, and the question is squarely presented here, whether, under the circumstances of this case, there was an implied warranty upon the part of the plaintiff, or, to speak more accurately, an implied condition, which the law will presume to have been a part of the contract itself, that this spur wheel should be free from any latent defect that would render it improper and unsafe to use it for the purposes for which it was designed.

Before taking up the discussion of that question, it is well to dispose of several questions that were litigated upon the trial and argued with great force by counsel for both parties.

First. It is claimed that it was negligence upon the part of the defendant, in view of the severe windstorms to which the harbor at Buffalo is subject, to leave the tower at rest, relying upon its being held by any interior machinery; that it was contemplated by the parties that the machinery devised by the defendant and furnished by the plaintiff was for the purpose only of operating the tower at a time when a large number of defendant's employés were present in and about the tower, assisting in operating it; that it was not intended that such machinery should be relied upon to protect the tower when standing alone and unguarded, and exposed to severe windstorms, under which it might obtain a momentum, if once started, which would destroy any machinery, no matter how perfect or how strongly constructed; but that brakes or chains should have been supplied by the defendant itself, and, for aught that the plaintiff knew, such brakes and chains would be supplied for that purpose, which would have prevented the disastrous results which followed the breaking of the spur wheel. Some evidence was offered upon the trial to the effect that one other movable tower in the city of Buffalo used chains and brakes when the tower was at rest. But it appeared that these chains and brakes were used at a time when the tower was moved by an engine situate some distance from the tower, and when the engine ceased operations and the tower was left there was nothing to prevent its being moved, except its own weight, and that when thereafter machinery similar to that ordered of the plaintiff was installed in this tower, they still continued the use of the chains and brakes. There was evidence that there were quite a number of other towers moved by internal machinery, such as was devised for the defendant's tower on the docks of different elevators in Buffalo harbor, and it did not appear whether any of them used any brakes or chains. The plaintiff argued further from this, that, if the brakes and chains had been used, then even had the force of the wind been sufficient to have broken the wheel with the internal flaw, the result of the elevator moving along the dock and toppling into the creek would not have followed, and therefore that the accident itself was not the proximate or natural result of a breach of the implied or express warranty had there been one. But, in the view that I have taken of this case, I do not deem it necessary to pass upon these questions. The view that I have taken of the case disposes, if correct, of the defendant's counterclaim upon other grounds, and upon the main ground that there was no warranty, express or implied, that the wheel in question should be free from any internal defect.

Second. A large amount of evidence was offered upon the trial as to whether the accident was due at all to the internal defect in the wheel, and upon the question whether it was not due to a combination of causes producing a force which would have ruptured the wheel even had it been perfect and a great deal stronger than it was even designed to be, which expert testimony was given by very eminent engineers upon the question as to the amount of force that was applied at the time the wheel ruptured; some of them going so far as to say that the fact that the steel key was twisted, and that the keyway itself, planed out of the solid cast iron, was depressed an eighth of an inch, was evidence that the power applied at the time that the wheel ruptured was much greater than would have been sufficient to have ruptured the wheel had it been perfect and without any flaw at all. All of the engineers agreed that the force of the wind, blowing at the rate of 60 miles an

hour, exerted upon the side of the tower facing the direction from which the wind came, and assuming that it was blowing at direct right angles, with full force against the side of the tower, it would exert at the maximum a force not to exceed 50,000 pounds. This would mean a strain upon the cable of 50,000 pounds and a strain at the hub of the wheel of about 300,000 pounds, which all concede was not enough to rupture a perfect wheel. But, as said by one of the experts, 50,000 pounds pressure was the maximum. The evidence shows that the wind was not blowing at right angles and not nearly a right angle; that the other tower stood directly southeast, of the same height and dimensions, only 30 feet away, and therefore the maximum pressure must necessarily be reduced almost one-half. There was also evidence from the experts called by the plaintiff that, if there had been a slack in the cable, even of four inches, that, together with what is called the "backlash" of the cable wound upon the drum, would have permitted the tower when moved by the wind to have acquired a momentum before the slack in the cable was taken up, and the backlash of the cable wound on the drum taken up, sufficient to have exerted a force when checked by the cable becoming taut, to have ruptured a wheel much stronger than the wheel in question, even had it been perfect. But the very construction of the tower, the manner in which the cables wind and unwind when the tower is in motion, one cable winding on the drum and the other unwinding from the drum, and both cables necessarily made taut by means of a turnbuckle on each cable before the tower began to move, I fail to see how, when the tower came to rest, any slack could have remained in either cable; besides, several witnesses upon the part of the defendant testified that on the very night of the accident they examined the cables casually, it is true, and found them taut. In addition to this, the evidence of the engineer, Souther, called by the defendant, shows that if there were a slack of even four inches in either of the cables, instead of being suspended in the air from the post to which it was attached clear to the tower, it would lie flat upon the dock for the greater part of that distance, and could be deflected along the dock 42 inches each way, or 7 feet in all; a condition which the defendant's men could not have failed to notice had it existed.

So far as the backlash is concerned, in deciding between the opinions of the eminent engineers, who knew far more about the subject than the court, it nevertheless becomes the court's duty to decide which appears the better reason. The witness Souther states that the backlash, as proven by actual experiment, would be taken up in one-half of a revolution of the worm, and that when the backlash was taken up the result would not be a sudden stoppage of the tower, but what he described as a cushion stop. The resistance upon the drum, even assuming the existence of the backlash, would prevent the sudden change which might have resulted from taking up a slack in the cable. I have, therefore, come to the conclusion upon this question that the wheel was ruptured not by reason of any tremendous force being exerted on account of the existence of slack in the cable or backlash, permitting the tower to acquire a great momentum, but that it was ruptured solely by reason of its inherent weakness, which disabled it from withstanding the force exerted by the wind blowing at the rate of 60 miles an hour.

The rule of common law, caveat emptor, and not the rule of civil law, caveat venditor, applies to all sales of personal property in the state of New York, whether executed or executory. But to this rule, as to all rules of law, there are certain well-grounded exceptions recognized by our courts. The first exception is that where the seller is the manufacturer of the goods sold, whether the contract be executed or executory, there is an implied condition or warranty that the article sold shall be fit for the purpose for which it is sold, if the particular purpose be specified, and that it shall be free from any internal defect, which renders it unfit for the purpose specified. Second, in the case of an executory contract for the sale of goods of a particular kind, where the goods are either not in existence at the time of making the contract, or are subsequently to be procured and delivered, or are to be shipped thereafter from a distant point, the purchaser having no opportunity to examine, there is an implied warranty or condition that the goods when delivered shall be merchantable and of the kind and description

specified. Third, where in a contract for the sale of personal property, either executed or executory, the purchaser relies entirely upon the judgment of the seller, describes the article desired, and the purpose for which it is desired, and leaves it entirely to the judgment of the seller to select and deliver the required article, there is an implied condition that the article shall be fit for the purpose disclosed to the seller. This doctrine does not rest upon the theory of the warranty as a collateral agreement, but it is a part of the contract itself that the seller will procure and deliver the particular thing required, and the parties deal upon the theory that the purchaser, relying entirely upon the judgment of the seller, the seller in selecting and delivering an article other and different from the one ordered simply fails to comply with his contract. In the case at bar the plaintiff and defendant stood upon the same plane; each had the same knowledge of the kind of machinery ordered and the purpose it was to serve as the other. To use an old expression found in the books, they dealt at arms' length. The defendant devised the plan of, the kind of, and the size of the machinery which it desired, and contracted with the plaintiff to manufacture and procure it. In the view which I take of this case, therefore, if the plaintiff had manufactured all of the machinery ordered, in accordance with the specification and plan delivered to it by the plaintiff, had used good material, applied skillful workmanship, and produced the machinery as ordered by the defendant free from any flaw, and the machinery so manufactured and delivered when installed in the defendant's tower had utterly failed to work, or had proved altogether too light to do the work required of it, and had collapsed by reason of it not being sufficiently strong and large, and by reason of fault in designing it, then the defendant would have had no cause of action against the plaintiff; for, under the circumstances of this case, the defendant having obtained exactly the thing which it ordered, and the defect not being in its manufacture, but in its design, there was no warranty nor implied condition upon the part of the plaintiff that it would do the work for which the defendant designed it, nor, under the circumstances of the case, would the plaintiff have owed to the defendant any duty to have advised it that the machinery was improperly designed. Upon the other hand, had the plaintiff manufactured the spur wheel in question, and delivered it to the defendant for use in its tower, and it had contained the flaw in question, and the results which followed here had followed the use of that wheel, then clearly, within all the authorities, the plaintiff would have been liable to the defendant for such damages as were the proximate and natural result of the breaking of the wheel, and therefore the case narrows itself down to this: Inasmuch as the wheel was not manufactured by the plaintiff to the knowledge of the defendant, but was procured by the plaintiff from a reputable manufacturer, and contained the latent and undiscoverable flaw which it did contain, is the plaintiff liable for such damages as naturally flow from the breaking of the wheel solely upon the ground that the contract was executory and not executed? For, clearly, if at the time the wheel was ordered the plaintiff had had it in stock, already made by the Gleason Company, of the exact size and dimensions specified in the plan submitted by the defendant, and the plaintiff had said, "here is a wheel exactly such as you have drawn, made by the Gleason Company, which you can have for so much money," and the defendant had purchased it, taken it away and used it in its tower, then clearly, within all the authorities, the plaintiff would not have been liable upon any implied warranty of fitness, upon account of the existence of the latent defect, solely because the contract was executed and not executory. If, therefore, the rule which now obtains in executory contracts, that there is an implied condition that the property purchased when delivered shall be of the kind ordered and merchantable, extends to a latent defect in the property, undiscoverable upon inspection and unknown to both the seller and purchaser, then there is in every executory contract of sale the same implied warranty against latent defects in manufacture that obtains where the seller is the manufacturer, and all distinction between the two classes of cases is at once swept away, and it becomes immaterial, where an article is ordered to be delivered in the future, whether the seller is to manufacture or whether he is to order it of others. If this is the rule, it should rest upon some

sound and logical reason. The rule that implies the warranty by the manufacturer against secret defects, which obtain in the process of the manufacture itself, rests upon and has for its foundation the presumption that the manufacturer either knew of the care that is used in the manufacture of the article, or was bound to know what degree of care was used in such manufacture. None of these things can be known by the purchaser, and therefore the rule is grounded upon sound reason. The rule which obtains in an executory contract of sale of personal property, that there is an implied condition that the goods ordered shall, when delivered, be of the kind ordered and merchantable, rests upon the same solid foundation—the presumption of superior knowledge upon the part of the seller. He knows by whom the goods are manufactured, presumably, from whom they are to come, and, presumably, their condition. When they are delivered, the buyer is bound to promptly examine, and if they are not of the kind ordered, or if of that kind, not merchantable, he is bound to return, or offer to return, them promptly, and notify the seller of the situation, and if he fail to do that, he is deemed to have accepted the delivery of the goods as a compliance with the seller's contract, and cannot be heard thereafter to complain. It is most pertinently asked by defendant's counsel whether this rule cannot be carried a step further, because, if there is a condition implied in an executory contract that the goods shall be of the kind ordered and merchantable, and they are apparently of the kind ordered and apparently in merchantable condition, and no amount of skill and care in their inspection will disclose the secret defect, then, applying the rule that a party is bound to return, or offer to return, only when the defect is apparent and can be discovered by inspection, but is not bound to offer to return or to return if the effect cannot be discovered upon inspection, and can only be discovered when the goods themselves are destroyed by use, then why may it not be said that in an executory contract of sale, where there is a latent defect in the goods delivered not discoverable upon inspection, the mere fact that the contract is executory implies a warranty that the goods are free from any secret defect which survives an acceptance. The obvious answer to this very pertinent question is, first, that there is no decided case holding that upon a contract of sale of goods not manufactured by the seller, the contract being purely executory, no fraud being present, that there is an implied warranty against secret defects, and, second, that the moment it be conceded that the defect is latent and undiscoverable, either by the seller or the purchaser, the reason for the presumption of the implied warranty or condition ceases, and the rule contended for would have no logical ground to stand upon, as the rule in the case of a manufacturer does have.

The leading case upon the subject of implied warranty upon the part of the manufacturer in the state of New York is Hoe et al. v. Sanborn, 21 N. Y. 552, 78 Am. Dec. 163. In that case Judge Selden, in a very exhaustive opinion, reviews the leading English cases upon the subject, and states as a foundation of the rule holding a manufacturer liable for secret defects that the manufacturer either actually or presumably has knowledge of the defects, whether the article was actually manufactured with his own hands or through the medium of his servants and agents. At the conclusion of his opinion he states the rule to be as follows: "The vendor is liable in such cases for any latent defect not disclosed to the purchaser, arising from the manner in which the article was manufactured; and if he knowingly uses improper materials, he is liable for that also, but not for any latent defect in material which he is not shown and cannot be presumed to have known." It will be observed that the rule was not carried to the extent that it has been in some later cases, holding the manufacturer liable where the latent defect arose, not from any improper method used in the process of manufacture, but arose from a defect which was latent and unknown to the manufacturer in the raw material used. This doctrine Hoe v. Sanborn expressly repudiates, for the reason that the rule holding the manufacturer liable ceases when it is shown that he had no knowledge, and could have none, of the secret defect in the raw material which produced, without his fault, the latent defect. This case has been followed in the state of New York and in many of the states of the Union, and its authority has never been questioned. It was distinguished

in Rodgers v. Niles, 11 Ohio St. 48, 78 Am. Dec. 290. In that case the Supreme Court of Ohio, by a vote of three to two, held the manufacturer of goods for a special purpose liable for a latent defect in the article which arose from an unknown and latent defect in the raw material used, although it appeared that the manufacturer could not have discovered this defect by any known test. Hoe v. Sanborn was cited upon behalf of the unsuccessful parties, and its doctrine was adopted by two of the judges, but the majority opinion distinguished by saying that the case of Hoe v. Sanborn involved an executed contract and not an executory contract. A careful reading of the statement of facts in Hoe v. Sanborn, at page 553 of 21 N. Y. (78 Am. Dec. 163), will advise the court of its error. It is as follows: "Upon that order, and subsequent thereto, the plaintiffs manufactured the saw in question, and forwarded the same, on the defendant's order, to Port Huron in Michigan." In Jones v. Bright, 5 Bing. 533, one of the leading English cases, a manufacturer of sheathing copper agreed to deliver copper for sheathing a certain ship. After one voyage the copper was found full of holes, due to some secret defect in the copper. The judge presiding at the trial submitted to the jury two questions, whether the defect in the copper was due to improper methods in manufacture, or whether it was due to an undiscoverable defect in the raw material used in the manufacture of the sheathing copper; thereby expressly recognizing the rule as laid down in Hoe v. Sanborn. The jury returned a verdict for the plaintiff, but answered the two specific questions by saying that the jury did not know, and could not ascertain from the evidence, whether the secret defect was due to improper process in the manufacture, or to a latent defect in the raw material used. Nevertheless, the court gave judgment for the plaintiff, upon the theory that it was for the manufacturer to show that the defect in the manufactured article was not due to any neglect upon his part.

Upon the question of the liability of the manufacturer of an article made for a specific purpose, the opinions of the court in Carleton v. Lombard Ayres & Co., 149 N. Y. 137, 43 N. E. 422, and Bierman v. City Mills Co., 151 N. Y. 482, 45 N. E. 856, 37 L. R. A. 799, 56 Am. St. Rep. 635, are exceedingly interesting, and the rule laid down in Hoe v. Sanborn is reiterated with great force in the opinions of the court.

An apt illustration of the rule that prevails in cases where a person not the manufacturer agrees to furnish an article fit for a specific and declared purpose, and where the buyer relies absolutely and entirely upon the judgment of the seller, and not in any wise upon his own judgment, is the leading English case of Brown v. Edginton, 2 M. & G. 279. This is known as the "Rope Case," where a wine merchant applied to a manufacturer of and dealer in ropes, and wished to be supplied with a rope of sufficient size to be fit for elevating casks of wine upon a crane. The seller sent his agent and made measurements of the crane and of the size of the casks of wine and their weight, and then ordered a rope from a certain manufacturer, determining the size which the rope should be and the materials from which it should be manufactured, and delivered the rope, which, when being used to elevate a cask of wine, broke, destroyed the cask, and spilled the wine. The seller was held liable upon an implied warranty that the rope would be fit for the purpose specified. This case furnished a most apt illustration of the class of cases referred to, where the seller is liable upon the implied warranty or implied condition, because he assumes to determine the nature of the thing required by the buyer, and the buyer has delegated to him the authority to determine it, and when he delivers a thing unfit for the purpose he has simply failed to comply with his contract to deliver the thing contracted for. It does not appear in the Brown Case, from the statement of facts or in the opinion of the court, whether the rope broke by reason of being constructed of improper materials—for instance, cotton instead of hemp—or because it was not large enough for the purpose, or because there existed some unknown and secret defect in the material of which it was composed which was undiscoverable upon inspection. Had this latter fact appeared, it might have been that the decision would have been different.

A careful study and reading of the reported cases and a careful study of the text-books upon the subject readily convinces the student that much of

the apparent conflict in the cases is due to loose language employed in the determination of the several cases as they arise, and in using language much broader than is necessary to a proper disposition of the case itself. As an illustration of this, take the case of Howard v. Hoey, 23 Wend. 350, 35 Am. Dec. 572. That is one of the leading cases in the state of New York upon the subject of the implied condition contained in executory contracts of sale of articles, either not in existence, or which are to be shipped from a distance in the future. The ale which formed the subject of the action was brewed by the plaintiffs; in other words, they manufactured it. The contract was executory, because the ale was not in existence when sold. When the ale was delivered, it was found to be not merchantable, and notice and an offer to return was made by the defendant. The opinion of the court, written by Judge Cowen, does not lay much stress, if any, upon the fact that the plaintiffs were liable as manufacturers, but puts the decision upon the ground that the contract was executory, and therefore there was an implied condition that the goods upon arrival would be found to be merchantable. The defect in the ale was patent and discoverable upon inspection and use. Judge Cowen lays down a rule perfectly applicable to the facts in the case, which was being decided, but far too broad to apply to cases where in executory contracts there exists a latent defect in the article sold, not discoverable upon inspection; and he says, at page 353 of 23 Wend. (35 Am. Dec. 572), of the opinion, that in executory contracts for the delivery of an indeterminate thing of a particular kind, that the thing itself must be good, lawful, merchantable, of suitable quality, good and sufficient of its kind; that is, it should not have, any remarkable defect. This language is certainly broad enough, taken literally, to cover the cause of a latent defect such as was revealed in the spur wheel in the case at bar, and yet that thing was not necessary to the determination of the case before the court.

As said, this case is one of the leading cases in the state of New York upon the subject of implied condition in executory contracts, that the goods when delivered shall be of the kind ordered and merchantable, but it does not go to the extent contended for here. It has been followed with approval, so far as the facts of the case were concerned, in a large number of cases, notably Reed v. Randall. 29 N. Y. 358, 86 Am. Dec. 305, and in a large number of text-books and in various encyclopedias of law, it is referred to in notes supplementing the text as authority for the proposition that in every executory contract there is an implied warranty against secret defects.

In Randall v. Newson, L. R. 2 Q. B. D. 102, a carriage maker was applied to by the owner of a carriage to furnish a carriage pole, which he designed and manufactured. The pole, after delivery and in ordinary use, broke, the horses ran away and were injured, and the Court of Queen's Bench held that the manufacturer was liable, not only for the value of the pole, but for the value of the horses. In the opinion in this case but little stress is laid upon the circumstance that the seller was the manufacturer of the pole. The greatest stress is laid upon the fact that the seller designed and produced the pole for a specific purpose, selecting the material, and determining the dimensions. A careful reading of the case does not show whether the pole broke by reason of its being composed of improper materials, by reason of its being too small for the purpose, or by reason of some secret and unknown defect in the wood itself, and the opinion of the court, read as an essay upon the law, and not as applicable to the particular facts of the case itself, is certainly broad enough to be construed as laying down the doctrine that in an executory contract there is an implied warranty against latent defects. In England, under the act of 1893, known as the "Sale of Goods Act," an attempt has ben made to codify the law in regard to implied warranties of all kinds, and that act came for construction before the English court of appeals in Wren v. Holt, L. R. 1 K. B. (1903) page 610. In that case a tippler went into a beerhouse of the defendant, and called for Holden's beer, a kind of beer that was manufactured by a corporation known as "Holden & Company, Limited." The beer seller gave him Holden's beer, which he drank, and became very ill. It appeared by an analysis that Holden & Company had purchased of a reputable manufacturer a large amount of sugar, which was used in the manufacture of their beer. This sugar contained arsenic

in poisonous quantities, but it was conceded that the defect was undiscoverable upon inspection, and could only be discovered by actual use. The court submitted to the jury the specific question whether the plaintiff relied for the good quality of his beer on the skill or judgment of the defendant, and the jury answered this question in the negative, although they found a verdict for the plaintiff. Upon a rule for a new trial the case was elaborately argued. Justice Williams delivered the opinion, and he cited the provisions of the sale of goods act, one of the sections of which act provided that there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract of sale, except as follows: By subdivision 1 this appears: "Where the buyer expressly or by implication makes known to the seller the particular purpose for which the goods are required, so as to show that the buyer relies on the seller's skill or judgment, and the goods are of a description which it is in the course of the seller's business to supply (whether he be the manufacturer or not) there is an implied condition that the goods should be reasonably fit for such purpose." The court held that the seller was not liable under this subdivision; the jury having found that the buyer did not rely on the seller's skill or judgment. Subdivision 2 of the section was as follows: "Where goods are bought by description from the seller who deals in goods of that description (whether he be the manufacturer or not) there is an implied condition that the goods should be of merchantable quality, provided if the buyer has examined the goods there shall be no implied condition as regards defects that such examination ought to have revealed." The court held the seller liable directly to the consumer for damages under the second subdivision of the act, upon the ground that the goods were bought by description from the seller, who dealt in goods of that description, and that, therefore, under the literal interpretation of the subdivision, there was no escape from the conclusion. It is proper to say that by section 61 of the same act, the following provision appeared: "The rules of the common law are to continue to apply to contracts for the sale of goods, save in so far as they are inconsistent with the express provisions of the act." At common law, assuming that beer could be called an article of food, the seller was clearly liable for having sold provisions that were unwholesome directly to a consumer, it being the settled rule of the common law that in such cases there is an implied warranty that the goods sold for immediate consumption are wholesome. Upon the argument counsel contended strenuously that this statute entirely altered the rule of the common law. Justice Williams, in speaking of this argument, said: "I have only one other remark to make, and that arises on a suggestion that the effect of section 14 of the act is to invert the rules of law which were applicable before the act, and to apply to latent defects a rule formerly applicable to patent defects, and to apply to patent defects the rule formerly applicable to latent defects. It is not necessary to decide this point, but I think that, if the subsections are considered, it will be found that no such alteration of law has been made." The court thereupon denied the motion for a new trial, discharged the rule, and directed judgment for the plaintiff upon the verdict. So far as this English statute goes, it does not seem, as said by Justice Williams, to have altered to any great extent the rules of the common law, but has codified them so far as such a codification is possible, and has abolished the distinction between the manufacturer and a seller not a manufacturer, under certain circumstances, which at common law really placed them upon the same footing. But there is nothing in the facts of the case at bar that will bring it within the definition even of the English act. The buyer did not rely on the seller's skill or judgment as to the particular purpose for which the goods were intended, nor were they, within the meaning of the language employed, bought by description; and even in England, under the English act, this case would necessarily be determined under the rules of the common law.

It would be needless, and in fact worse than useless, to attempt in this opinion to review the vast multitude of cases which have arisen in England and in the different states of the United States. When these cases are critically examined, it will be found that in every one of them where there was a latent defect for the existence of which the seller was held liable the seller was either the manufacturer of the article itself, or the buyer relied upon his skill and judgment to devise the thing itself for the particular pur-

pose for which it was required, and the seller undertook, either by manufacture or by selection from others, to devise or select a thing which would answer the buyer's purpose; the buyer leaving the determination of that question entirely to the seller.

Counsel for the defendant has cited upon his brief a short article upon this question in 16 Harvard Law Review, 590, in which the writer endeavors to show that there ought to be no sound distinction between the liability of a seller under an executory contract for goods having a patent defect and those having a latent defect, and refers to the English sale of goods act as a step in advance and an abolition of this distinction in that country, and seems to recognize the fact that the distinction does exist here, and should be remedied by legislation. Take the case of the Kellogg Bridge Company v. Hamilton, 110 U. S. 108, 3 Sup. Ct. 537, 28 L. Ed. 86. That is a case which laid down the doctrine of implied warranty where the builder and manufacturer of a bridge sold it to another, with all its defects in construction due to carelessness, the court held, under the circumstances of that case, that there was an implied warranty, and yet the case has been cited a hundred times as authority for the proposition that in a contract of sale, purely executory, of goods not manufactured by the seller, there is an implied warranty against latent defects. A case in the state of New York which would be absolutely conclusive upon me were I inclined to an opposite opinion was decided in this judicial department in Reynolds v. Mayor, Lane & Co., 39 App. Div. 218, 57 N. Y. Supp. 106. In that case an executory contract was made with the defendants, under which they agreed to supply in the future certain water-closet tanks. The defendants ordered the tanks from a Cincinnati company. They were placed in position in the plaintiff's building, and it was then discovered that they failed to work by reason of some latent defect. There was strong evidence in the case of an express warranty, but the trial justice took this question from the jury, and submitted to them solely the question, was there an implied warranty, the contract being executory? The jury found for the plaintiff. The court reversed the judgment upon the ground that, the defendant not being the manufacturer, there was no warranty against a latent defect, but the court strongly intimated upon another trial an express warranty might be established. The court, in concluding its opinion, says: "It will be seen that the defendant not only had nothing whatever to do with the manufacture of the article sold, but that it never even saw it. In these circumstances, with what propriety can it be assumed that the defendant was so familiar with the process or manufacture of these articles as to be aware of the existence of some latent defect therein, or upon what principal of justice can it be held that, because the articles were designed for a particular purpose, they were sold under an implied warranty that they were adapted to that purpose. We find no authority for such a proposition, but, upon the contrary, the cases are numerous which hold that to bring a party within the rule adopted by the trial court he must be the manufacturer as well as the seller of the property sold"—citing many cases. This language, while rather broad, and laying down as universal a rule to which there are some exceptions not noticed in the language used, nevertheless lays down the true rule of law applicable to the facts in the case which the court decided. The question was squarely before the court upon an executory contract for the future sale and delivery of goods, fit for a specific purpose, and the court held that there was no implied warranty against latent defects. Surely, upon the facts in that case, had the articles, when they arrived, been of a kind different from those ordered or not merchantable, having patent defects discoverable upon inspection, then, within all the rules applicable to that class of contracts, the defendant could have returned, or offered to return, and escaped any liability.

One contention upon the part of the defendant's counsel most ingeniously urged is that, under the circumstances of this case, inasmuch as the plaintiffs were applied to by the defendant to manufacture these articles, and the plaintiff suggested that it would be better to procure them elsewhere (a suggestion in which the defendant's agent concurred), that the plaintiff, by selecting the Rochester firm as the manufacturer, made it the plaintiff's agent, and, therefore, the defect arising from improper methods of manufacture by the plaintiff's agent, the plaintiff became liable, within the case of Hoe v. Sanborn. But I cannot subscribe to this contention. It might with even greater force

be urged that, because the defendant authorized the plaintiff to procure the goods from any manufacturer that it pleased to order from, the defendant thereby constituted the plaintiff its agent for the purchase of the goods. Either of these conclusions would be equally strained. As shown by the correspondence between the plaintiff and the Gleason Company, the plaintiff, in perfect good faith, purchased from the Gleason Company goods of a certain description, and the relation of vendor and vendee arose between the Gleason Company and the plaintiff, and not the relation of agent and principal.

A certain remark made by Judge Selden in Hoe v. Sanborn has in a number of cases been construed as establishing in the case of a seller of goods procured by him from the manufacturer the same extreme doctrine of liability as obtains in the case of a sale by the manufacturer himself. The language used by Judge Selden, at page 562 of 21 N. Y. (78 Am. Dec. 163), is: "Where the vendor has manufactured the article with his own hands, the inference of knowledge would plainly in many cases be strong enough to charge him even in an action for fraud. But if the manufacturing is done by agents, the general principles of law would hold the principal responsible for those whom he employs. Wherever the vendor, therefore, has himself manufactured the article sold, or procured it to be done by others, if honesty and fair dealing are ever to be enforced by law, a warranty should be implied." In a number of cases where Judge Selden's language has been quoted, only the latter part of it has been quoted, "Wherever the vendor, therefore, has himself," etc., "or procured it to be done," etc., the word "procured" has been seized upon as meaning buying it in the open market from another manufacturer, or ordering it from another manufacturer, when it is very clear from the text of the whole of the quotation from the learned judge's opinion that by procuring it to be done is meant procuring it to be done by the manufacturer's own servants or agents.

Upon the whole case, therefore, I am of the opinion that there was no implied warranty upon the part of the plaintiff against any secret defect in the spur wheels which broke and brought about the accident. For that reason, the defendant's claim upon its counterclaim should be dismissed, and the plaintiff should have judgment for the amount due upon its claim, with costs of the action.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, NASH, and KRUSE, JJ.

Roberts, Becker, Messer & Groat, for appellant.
Lewis & Lewis, for respondent.

PER CURIAM. Judgment affirmed, with costs, on opinion of Charles J. Bissell, referee.

WILLIAMS, J., not voting.

---

### In re SCHROEDER.

(Supreme Court, Appellate Division, First Department. May 18, 1906.)

REFERENCE—REPORT—FINDINGS AND CONCLUSIONS.

On reference of the account of an administratrix for examination and objections, the referee's report stated that there were a certain number of objections to the account, and that he "disposed of the issues as follows." This was followed by numbered paragraphs, in each of which a specific objection was taken up, the facts in regard to it stated, and a conclusion reached. On exceptions to the report, it was modified and affirmed, and a decree entered from which an appeal was taken. Code Civ. Proc. §§ 1022 and 2546, require referees to make separately numbered findings of fact and conclusions of law to which exceptions may be filed. *Held,* that. while the referee's report did not strictly comply in form with the requirements of the statute, it should, after the appeal, and in view of the fact that no proposed findings were submitted and refused, be regarded as sufficient.