### GREAT ATLANTIC & PACIFIC TEA CO. v. SMITH.

#### Civil Action No. 718.

District Court, W. D. Arkansas, Fort Smith Division.

Jan. 14, 1948.

Pryor, Pryor & Dobbs, of Fort Smith, Ark., and Owens, Ehrman & McHaney, of Little Rock, Ark., for plaintiff.

Sullins & Perkins, of Fayetteville, Ark., for defendant.

JOHN E. MILLER, District Judge.

On March 7, 1947, the plaintiff filed its complaint in the Fayetteville Division against the defendant and two other persons doing business as Litteral Canning Company and also individually against the defendant Clarence T. Smith.

The case was transferred to the Fort Smith Division on April 15, 1947, and on April 28, 1947, the plaintiff upon notice dismissed the complaint as against the defendants J. W. Cain and G. A. Coulter, leaving only the defendant Clarence T. Smith.

In the complaint the plaintiff seeks to recover the sum of $6,747.25 with interest on $6,557.95 from March 8, 1945, and interest on $189.30 from June 17, 1946.

In due time the answer of the defendant was filed and following a hearing on requests by both parties for admission of facts and a pre-trial conference on August 27, 1947, the parties agreed that they would be able to stipulate the material facts.

On November 5, 1947, the parties filed a stipulation of facts to which were attached certain exhibits and on November 25, 1947,

a supplemental stipulation of facts was filed. On that date the case was submitted to the court upon the stipulations and exhibits thereto. The parties were allowed time in which to file written briefs in support of their respective contentions. The briefs have now been filed and have been considered by the court along with the pleadings, the stipulations of facts and exhibits thereto, from all of which the court finds the facts to be as follows:

### Findings of Fact.

I. The plaintiff, The Great Atlantic & Pacific Tea Co., is a corporation organized and existing under and by virtue of the laws of the State of Arizona and is authorized to do business in the State of Arkansas. The defendant, Clarence T. Smith, is a citizen and resident of the Western District of Arkansas and is engaged in business under the name of Smith Canning Company. The amount involved herein exceeds $3,000 exclusive of interests and costs.

II. On January 26, 1945, the defendant, Clarence T. Smith, telegraphed R. U. Wilson, agent of the plaintiff, as follows:

"Do you want 3300 cases standard twos spinach 1.10 Government Certificate."

On the same date the said R. U. Wilson wired the defendant as follows:

"Will accept certificated spinach offered if last of February shipment okay advise if available our labels."

On February 2, 1945, the defendant wrote the said R. U. Wilson advising that he had found by investigation that he could not ship the spinach in refrigerator cars, because a shipment of 1650 cases in each car would not bring the weight up to the 65,000 pound minimum. On February 6, 1945, Wilson replied to the defendant and advised him to increase the order from 3300 cases to 3600 cases with a proportionate change in the extended figures.

III. The negotiations were reduced to a formal contract dated January 30, 1945, a copy of which is attached to the stipulation as exhibit 5. The terms of the contract reflect that the plaintiff purchased from the Smith Canning Company, the trade name of the defendant, 3600 cases 24/2 Iona Label Full Standard Spinach at $1.10 Dozen; that the same was to be shipped in box cars each containing 1800 cases of 24 cans with Government Grade Certificate attached to invoice.

The contract contained the terms of payment and other matters that are not material to a determination of the issues before the court. The contract further provides:

"Any dispute involving the quality or grading of canned foods is to be settled by submitting samples to the local office of the U. S. Agricultural Marketing Service whose decision will be final and binding on all concerned. Other disputes to be arbitrated in the usual manner."

IV. Under the contract the defendant shipped to the plaintiff 3600 cases 24/2 Iona Label Full Standard Spinach on or about February 20, 1945, and on February 22, 1945, sent the plaintiff an invoice of the spinach shipped. The shipments were delivered to the defendant at Jacksonville, Florida, in due course.

The defendant attached to the bills of lading, issued for each car, inspection certificates from the United States Department of Agriculture. One of the certificates, exhibit No. 11 to the stipulation, is dated February 24, 1945, and the other certificate, attached to the stipulation of facts as exhibit No. 12, is dated February 15, 1945. Before issuing these certificates the inspector of the United States Department of Agriculture with offices at Fayetteville, Arkansas, inspected the spinach shipped by opening some of the cans (12 in one lot and 9 in the other lot as revealed by the certificate), but it is not disclosed what tests were made by the inspector to determine the quality and grade of the spinach. The certificate dated January 24, 1945, recites that the grade is:

"U. S. Grade C or U. S. Standard Score Range 77 to 83 points."

The certificate dated February 15, 1945, shows the grade as follows:

"U. S. Grade C or U. S. Standard Score Range 79 to 84 points."

Both certificates recite that the inspection was made and certificate issued in compliance with the regulations of the Secretary of Agriculture governing the inspec-

tion and certification of the product, and that the quality and condition of the product as shown by the samples examined are as listed in the certificate.

V. Subsequent to the arrival of the spinach in Jacksonville, Florida, the Food and Drug Administration caused to be purchased and analyzed certain cans of the spinach and the analysis made by the inspector of said Administration disclosed that the spinach contained aphis.

VI. A libel action was instituted in the District Court of the United States for the Southern District of Florida, Jacksonville Division, on November 26, 1945, and resulted in the condemnation of 2427 cases of the spinach. See copy of libel information, exhibit 6 to the stipulation.

VII. Subsequent to the filing of the libel action the defendant, Clarence T. Smith, filed a claim in the name of the Smith Canning Company alleging that he was the owner of the spinach that had been seized under the process of the court. Likewise the plaintiff filed a similar claim and alleged that it was the owner of the seized spinach and prayed that it be permitted to defend the libel proceeding as the owner of the spinach.

VIII. On November 1, 1946, the court entered an order permitting the plaintiff to withdraw from the seized spinach samples for inspection and analysis and in accordance with that order plaintiff withdrew 96 cans of the spinach and caused the same to be inspected and analyzed. Later the plaintiff filed a supplemental answer in said court and stated that it was unable to reprocess the spinach and that it was of no value as a food.

IX. On November 6, 1946, the District Court of the United States for the Southern District of Florida entered a final decree in which it found that the spinach was adulterated and was therefore condemned in accordance with the provisions of Title 21 U.S.C.A. § 334. Costs of the proceeding were adjudged against the defendant, Smith, and the plaintiff, the Great Atlantic & Pacific Tea Company. See copy of decree, exhibit 10 to stipulation.

X. The plaintiff paid the defendant $7,-651.80 as the purchase price of the spinach and prior to the seizure of the spinach by the Food and Drug Administration had sold or disposed of all of the spinach except 2427 cases. The plaintiff has no knowledge as to whether any person suffered ill effects from eating the spinach.

XI. The plaintiff paid $761.73 freight on the 2427 cases shipped to it by the defendant. It paid $109.54 for having the spinach moved in and out of its warehouse, and the storage charge from December 17, 1945, to November 29, 1946, was $378.-60. It also paid $100 to Thornton & Company for an analysis of the spinach that was condemned and paid its attorneys $265.81 for services and expenses in connection with the condemnation of the spinach. The actual purchase price of the 2427 cases condemned was $5,245.96.

### Discussion.

The plaintiff contends that there was an implied warranty that the spinach tendered by the defendant was merchantable and reasonably fit for the purpose for which it was purchased.

Even though the contract of sale and purchase may have been made outside of Arkansas it was to be performed and was in fact performed in Arkansas and the law of Arkansas determines the nature, obligation and effect of the contract.

The Uniform Sales Act was adopted in Arkansas on March 31, 1941, Acts of Arkansas 1941, Act 428, page 1231. Section 14 of the Act reads as follows:

"Where there is a contract to sell or a sale of goods by description, there is an implied warranty that the goods shall correspond with the description and if the contract or sale be by sample, as well as by description, it is not sufficient that the bulk of the goods corresponds with the sample if the goods do not also correspond with the description."

Section 15 of the Act is as follows:

"Subject to the provisions of this act and of any statute in that behalf, there is no implied warranty or condition as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:

"(1) Where the buyer, expressly or by implication, makes known to the seller the

particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be reasonably fit for such purpose.

"(2) Where the goods are bought by description from a seller who deals in goods of that description (whether he be the grower or manufacturer or not), there is an implied warranty that the goods shall be of merchantable quality."

Section 71 of the Act is as follows:

"Where any right, duty or liability would arise under a contract to sell or a sale by implication of law, it may be negatived or varied by express agreement or by the course of dealing between the parties, or by custom, if the custom be such as to bind both parties to the contract or the sale."

Prior to the adoption of the Uniform Sales Act the Supreme Court of Arkansas in several cases had held that where there is no opportunity for inspection by the purchaser there is an implied warranty that the articles are merchantable and reasonably fit for the purpose for which they were intended. Bunch v. Weil, 72 Ark. 343, 80 S.W. 582, 65 L.R.A. 80; Thompson v. O. A. Crenshaw Grain Co., 113 Ark. 169, 167 S.W. 699; Neel v. West-Winfree Tobacco Co., 142 Ark. 505, 219 S.W. 326.

The facts do not disclose whether the defendant was the packer of the spinach or whether he purchased it from canning factories, but that does not appear to be material because he constracted to sell to the plaintiff 3600 cases containing 24 No. 2 cans bearing Iona Label, Full Standard Spinach, with certificate of the United States Government to be attached to the invoice showing the grade and quality of the spinach. The spinach that the defendant shipped was inspected by the local office of the United States Department of Agriculture at Fayetteville, Arkansas, and a certificate of inspection was furnished to the defendant which he attached to the bill of lading of each car shipped. These certificates disclose that the grade of the spinach was U. S. Grade C or U. S. Standard.

The spinach was shipped by the defendant on or about February 20, 1945, and it was received by the plaintiff in due course at Jacksonville, Florida, where it was placed in plaintiff's warehouse to be withdrawn if and when sold by plaintiff.

On November 26, 1945, approximately 9 months after the title to the spinach had passed to the defendant, the United States Attorney for the Southern District of Florida filed a libel proceeding against that portion of the spinach remaining in the possession of the plaintiff. In the libel of information it was alleged that the spinach was shipped in Interstate Commerce from Siloam Springs, Arkansas, to Jacksonville, Florida, and that the spinach was adulterated in Interstate Commerce. Attached to the libel of information is the affidavit of an analyst of the Food and Drug Administration stating that he had analyzed the spinach contained in three cases of 24 cans each and had found that the spinach contained aphis.

On November 6, 1946, the court entered a final decree condemning the spinach but did not specifically find that the spinach was adulterated when introduced into and while in Interstate Commerce as required by Section 334(a) of Title 21 U.S.C.A. The court did find that the spinach was adulterated in accordance with the provisions of Section 342(a) (3) of Title 21 U.S.C.A. The libel proceeding does not appear to fully conform to the statute. See United States v. Phelps Dodge Mercantile Co., 9 Cir., 157 F.2d 453. The record is silent as to whether notice of the filing of the libel proceeding had been published as required by the statute but both plaintiff and defendant knew of the pendency of the proceeding and had appeared therein. They are bound by the judgment of the court which determined the status of the spinach on the date of the filing of the libel proceeding. It was a proceeding in rem and the res was in the custody of the court. Therefore, the judgment is conclusive upon not only the parties herein, but upon everyone else. Bob's Candy & Pecan Co. v. McConnell et al., 140 Tex. 331, 167 S.W.2d 511; Kansas City Wholesale Grocery Co. v. Weber Packing Corporation, 93 Utah 414, 73 P.2d 1272.

The defendant does not contend that he is not bound by the judgment of the Federal Court in Florida in so far as the judgment determines the status of the spinach at the time of the entry of the judgment, but he does contend that he fully complied with the terms of the contract of sale and that the only condition in the contract of sale was that the spinach should be U. S. Standard grade and that the grade should be determined by a certificate from an inspector of the United States Department of Agriculture; that such a certificate was furnished and was attached to the bill of lading of each car showing the grade and quality of the spinach to be in accordance with the terms of the contract of purchase and sale and that the said contract of purchase and sale negatives the provisions of the Uniform Sales Act, creating an implied warranty that the goods shall be of a merchantable quality.

■ There is no doubt that the plaintiff was deprived of the value of 2427 cases of spinach and that it incurred certain expenses in addition to the contract price of the spinach. There is likewise no doubt but that the defendant knew at the time of the sale that the spinach was being purchased by the plaintiff for resale in due course of trade to the general public. The Uniform Sales Act does not interfere with the rights of parties to make their own contracts and to be bound by them. Hydrotex Industries v. Floyd, 209 Ark. 781, 192 S.W.2d 759; Section 71 of the Uniform Sales Act, supra.

The question for decision is whether the parties by their contract of purchase and sale intended to and did in fact provide that there should be no implied warranty that the spinach should be reasonably fit for the purpose for which it was purchased and sold, or, that the spinach should be of a merchantable quality.

Under the terms of the Uniform Sales Act the implied warranty "that the goods shall be reasonably fit for such purpose" does not arise except where the buyer expressly or by implication makes known to the seller the particular purpose for which the goods are required, and in addition thereto the buyer must rely on the seller's skill or judgment. Here the buyer did make known to the seller, at least by implication, the purpose for which the spinach was being purchased, but the buyer, plaintiff, did not rely on the seller's skill or judgment. Instead of relying upon the seller's skill or judgment the contract provided that there should be attached to the invoice a certificate of an inspector of the Department of Agriculture showing the grade and quality, and the contract specifically provided that:

"Any dispute involving the quality or grading of canned foods is to be settled by submitting samples to the local office of the U. S. Agricultural Marketing Service whose decision will be final and binding on all concerned."

The certificate of the inspector was obtained prior to the shipment of the spinach and, as heretofore stated, was attached to the bills of lading. That certificate showed the grade and quality to be "U. S. Grade C or U. S. Standard." Thus both parties bound themselves by contract when they nominated the Inspection Service of the Department of Agriculture to determine the grade and quality of the spinach.

■ The result of an agreed inspection cannot be disregarded unless it is shown that it was the result of fraud or such gross mistake as necessarily implies bad faith or a failure to exercise an honest judgment upon the part of the inspector. Hayes Grain & Commission Co. v. Federal Grain Co., 169 Ark. 1072, 277 S.W. 521; Id., 161 Ark. 51, 255 S.W. 307.

The plaintiff and the defendant were entitled to rely on the certificates that the spinach was U. S. Grade C or U. S. Standard and could decide from their knowledge of such a grade whether the spinach was reasonably fit for the purpose for which it was purchased and sold.

There is no proof that the inspector of the United States Department of Agriculture acted in bad faith or failed to exercise an honest judgment in making the inspection although limited to 12 cans in one car and 9 in the other. The court assumes that the certificates reflect his honest opinion of the grade and quality of the spinach at the time he made his inspection.

The defendant contends that even though the inspector of the Department of Agriculture was in error in his determination that the spinach was of the grade certified by him, yet, because of such certificate, no implied warranty arose, and he cites the case of Smith v. Tatum, 198 Ark. 802, 131 S.W 2d 619. The court has considered that case as well as cases from other jurisdictions in trying to determine the effect of the terms of the contract of purchase and sale and the certificates of the inspector and has concluded that even if the provisions of the contract of purchase and sale and the certificates of the inspector should be construed as preventing the creating of an implied warranty "that the goods should be reasonably fit for such purpose," under Section 15(1) of the Uniform Sales Act, that does not destroy the implied warranty "that the goods shall be of merchantable quality," under Section 15(2) of the Act.

In the case of Ryan, Respt., v. Progressive Grocery Stores, Inc., Appt., 255 N.Y. 388, 175 N.E. 105. 106, 74 A.L.R. 339, the New York Court of Appeals, speaking through Chief Justice Cardozo, said:

"The facts excluding a warranty under subdivision 1, we are to inquire whether there is a warranty under subdivision 2.

"Under the common-law rule long in force in this state, the warranty of merchantable quality was limited to sales by a manufacturer or grower. Hargous v. Stone, 5 N.Y. 73; Hoe v. Sanborn, 21 N.Y. 552, 78 Am.Dec. 163; Bartlett v. Hoppock, 34 N.Y. 118, 88 Am.Dec. 428; Carleton v. Lombard, Ayres & Co., 149 N.Y. 137, 43 N.E. 422; Bierman v. City Mills Co., 151 N.Y. 482, 45 N.E. 856, 37 L.R.A. 799, 56 Am.St.Rep. 635; Howard Iron Works v. Buffalo Elevating Co., 113 App. Div. 562, 99 N.Y.S. 163; Id., 188 N.Y. 619, 81 N.E. 1166; Williston, Sales, vol. 1, §§ 232, 233. All this has been changed since the coming of the Sales Law. Williston, supra. Dealer as well as manufacturer or grower affirms as to anything he sells, if purchased by description, that it is of merchantable quality. The burden may be heavy. It is one of the hazards of the business.

."Most of the sales of defective food stuffs have been dealt with by the courts as if subdivision 1 of the section defining warranties gave the exclusive rule to be applied. In some instances the goods were not purchased by description. In others, the courts may have been unmindful of the fact that the warranty of merchantable quality is no longer confined to manufacturers or growers. Innovations of this order are slow to make their way. Gradually, however, as the statute has become better known, the bearing of subdivision 2 upon sales of food in sealed containers has been perceived by court and counsel. The nature of the transaction must determine in each instance the rule to be applied. There are times when a warranty of fitness has no relation to a warranty of merchantable quality. This is so, for example, when machinery competently wrought is still inadequate for the use to which the buyer has given notice that it is likely to be applied. There are times, on the other hand, when the warranties coexist, in which event a recovery may be founded upon either. 'Fitness for a particular purpose may be merely the equivalent of merchantability.' Williston, Sales, vol. 1, § 235, and cases there cited.

"A dual warranty is thus possible for foodstuffs as for anything else. Both in this court and in others the possibility is recognized. Aron & Co. v. Sills, 240 N.Y. 588, 589, 148 N.E. 717, was an action for breach of warranty by retailer against wholesaler upon a sale of condensed milk. At the Appellate Division (211 App.Div. 21, 206 N.Y.S. 695), the warranty was treated as governed by subdivision 1. When the case came to us, we put that subdivision aside, holding that there was no necessity of deciding whether there was sufficient evidence of reliance, and placed our affirmance of the judgment upon subdivision 2. 'Whether under the circumstances of this particular purchase any inference is possible that the buyer relied upon the seller's skill or judgment we need not decide. For even were the trial court in error as to the existence of an implied warranty that the goods in question were fit for human consumption, bought as they were by description from one who dealt

in them, there was a warranty that they were of merchantable quality. If condensed milk is unfit for consumption, clearly it does not comply with this warranty.' 240 N.Y. 588, 589, 148 N.E. 717.

"A like rule has been declared in Massachusetts and in the federal courts; at all events in controversies between the dealer and the maker. Inter-State Grocer Co. v. George William Bentley Co., 214 Mass. 227, 101 N.E. 147 (sale of sardines); Parker v. S. G. Shaghalian & Co., 244 Mass. 19, 138 N.E. 236 (sale of candy); McNeil & Higgins Co. v. Czarnikow-Rienda Co., D.C. 274 F. 397, 400 (sale of sugar).

" 'Where the buyer specifies what he wants, he can, of course, not rely upon any superior knowledge of the seller that it will serve his purposes. If he did, he must give the seller some latitude of selection. But he may still insist that it must be of a quality which will pass in the market under that description, and he may rightly rely upon the seller to secure him such a quality.' L. Hand, J., in McNeil & Higgins Co. v. Czarnikow-Rienda Co., supra."

■ The record is devoid of any testimony concerning the nature of aphis or when the spinach became infested, but the court does take judicial knowledge that aphis is a genus of plant lice, comprising many species injurious to fruit trees and vegetables. The insect is popularly known as aphid. They are sluggish insects that suck the juices of plants and often do great damage. Webster's New International Dictionary, Second Edition, states:

"In addition to the sometimes winged males, and the usually wingless females which appear in the autumn and produce fertilized eggs, there are females, also usually wingless, capable of producing living young parthenogenetically for many generations in rapid succession, thus forming the large colonies often seen on plants."

The Federal Court in Florida found and judicially declared that the spinach was not merchantable because of the presence of aphis. The court does not know whether the aphis hatched after the spinach was processed or whether the spinach was infested at the time it was processed. Evidently the spinach at the time it was processed was infested with the insect or with the eggs of the insect, and whatever may have happened, the fact remains that the spinach, even if it was merchantable on the date of the contract of purchase and sale, did not remain merchantable until sold in due course of trade by the plaintiff. The record is also devoid of any proof as to whether spinach U. S. Grade C or U. S. Standard could be such and be infested with aphis. It may be possible that the spinach could have been infested with aphis and still be of the grade certified by the inspector but of a lower quality within the grade. The parties, neither plaintiff nor defendant, thought it necessary to enlighten the court on these questions.

■ The terms of the contract of sale and purchase are not inconsistent with the existence of the implied warranty of merchantability. The defendant had no intention of selling spinach that was not merchantable and the plaintiff did not intend to buy a product that could not be resold to the public for food. Public policy imposes on the seller of food a warranty that the article is merchantable and fit for human consumption regardless of whether the food is U. S. Grade C, U. S. Standard or any other grade. This warranty inures to the benefit of the purchaser for resale as well as to the ultimate consumer unless the purchaser by contract waives the right to rely on the warranty. The plaintiff, purchaser, did not waive such right in this case and is entitled to recover its actual damages because of the breach of the implied warranty that the spinach should be of a merchantable quality.

On its brief the plaintiff contends it should recover the following sums:

| | |
|---|---:|
| Purchase price of 2427 cases of spinach condemned | $5245.96 |
| Freight on 2427 cases | 761.73 |
| Handling charges | 109.58 |
| Storage charges | 378.60 |
| Cost of analysis | 100.00 |
| Attorney's fees in condemnation case | 265.81 |
| Total | $6861.68 |

In Bunch v. Weil, supra, the court approved an instruction permitting the plaintiff to recover the price which it paid for flour together with costs, drayage, freight and storage.

■ The court is of the opinion that the plaintiff is entitled to recover in this case the sum of $5245.96, purchase price of the 2427 cases of spinach that was condemned; $761.73, freight thereon; $109.58, handling charges; and $378.60, storage charges, making in all the sum of $6,495.87, with interest from date of judgment.

■ The court does not think the plaintiff is entitled to recover the amount it paid for having the spinach analyzed after the libel information was filed nor the amount paid its attorneys for appearing in the libel proceedings. At the time these sums were expended the defendant had entered his appearance in the court and had alleged that he was the owner of the spinach, although for some reason he did not press his claim, probably because the plaintiff was likewise present in court and was claiming to be the owner of the spinach. Such expenses as were incurred by the plaintiff were voluntary and were not expended at the request of the defendant.

### Conclusions of Law.

I. The court has jurisdiction of the parties hereto and the subject matter hereof.

II. The defendant is liable to the plaintiff for the breach of the implied warranty that the spinach shall be of merchantable quality in the following amounts:

| | |
|---|---|
| Purchase price of 2427 cases of spinach condemned | $5245.96 |
| Freight on 2427 cases | 761.73 |
| Handling charges | 109.58 |
| Storage charges | 378.60 |
| Total | $6495.87 |

As shown above the total liability is $6,495.87, together with costs and interest from date of judgment.

III. Judgment in accordance with the above in favor of the plaintiff should be entered and the exceptions of the defendant noted.