BASTIAN BROTHERS COMPANY, Plaintiff, *v.* REGAL DOLL MANU-FACTURING COMPANY, Defendant.

Supreme Court, Monroe County, October 18, 1928.

*Remington, Remington & Keating,* for the plaintiff.

*Herman H. Levy [Harlan W. Rippey* of counsel], for the defendant.

GOLDSMITH, J.   For many years the plaintiff had been extensively engaged in the manufacture of celluloid novelties at Rochester, N. Y.   The defendant was a manufacturer of dolls, with a factory in New York city, and placing upon the market about 4,500,000 dolls annually.   The dolls were designed to appear as near to life as possible, pressure near the middle producing a sound similar to a spoken word and a reclining posture giving the semblance of sleep.   Every part of the doll was made by the defendant except the " voice " and the " eyes," which were purchased from other manufacturers.   Metal eyes had been used exclusively by the defendant.   They were made by painting a representation of the human eye upon metal discs.   The discs were attached to a weighted bar, designated an assembly, which fitted inside of the doll's head and moved the eyes as the position of the doll changed, giving the doll the appearance of being awake or asleep.

The defendant desired to reduce the cost of dolls by procuring cheaper eyes.   The only other eyes upon the market were formed from celluloid.   They were made by lithographing or printing a design depicting the eye upon celluloid and shaping the material to fit over a metal disc.   The celluloid was secured to the disc by turning the edges over the back of the disc.   This process of fastening the shell was expensive and brought the cost of celluloid eyes higher than the price of metal eyes.   The defendant sought a shell which would slip over the disc and hold in place with a single operation.   Any additional act to secure the shell would increase the labor cost.   Simplicity of adjustment was necessary to reduce the cost below the price of metal eyes.

In March, 1925, Mr. Friedman, president of the defendant, consulted Mr. Austin, a representative of the plaintiff, for the purpose of ascertaining whether satisfactory celluloid eyes could be obtained to replace metal eyes and effect a saving.   The defendant had never manufactured eyes and had never used celluloid eyes and so informed Mr. Austin.   Mr. Friedman stated his requirements and submitted celluloid shells in illustration of the article

desired. During the negotiations which followed, Mr. Friedman asked if the plaintiff " could manufacture dolls' eyes that could work " and the answer was, " If the samples will work our eyes will work." An agreement was reached as to price, quantity, design and deliveries and a contract was executed by the parties. The written agreement described the merchandise to be furnished and carried the notation " as sample submitted." Provision was also included for approval by the defendant of samples to be supplied by the plaintiff before the goods should be manufactured. The manufacture of eyes was a new undertaking for the plaintiff, although handling celluloid was its regular business. After delays covering several months, which were attributed by each party to the other, samples submitted by the plaintiff were approved by the defendant. Pending such approval there was a controversy over the color, size and detail of the " iris." Meantime the defendant intimated that it was having some trouble over adjustments of the shells but expressed the belief that it was due to defective assemblies which were being produced by another manufacturer.

The first order called for 250,000 shells and later was increased to 300,000. In August, 1925, 40,000 shells were received by the defendant and paid for. Further deliveries were held up at the request of the defendant until fire permits could be secured authorizing storage of the celluloid shells. Nevertheless, the plaintiff continued to manufacture the shells. A substantial portion of the balance of the shells due under the contract was ready for shipment in October, 1925. The defendant continued to refuse delivery, claiming inability to secure fire permits. In the winter of 1926, for the first time, the defendant notified the plaintiff that the shells received were not satisfactory and no further deliveries would be accepted. The plaintiff was advised that the shells lacked uniformity in size, color and expression and could not be secured to the metal discs without the aid of an adhesive. Settlement of the differences between the parties failing, this litigation ensued. Upon the trial the plaintiff offered in evidence quantities of shells taken at random from the packages awaiting shipment and they were taken by the jury for examination. The verdict of the jury is decisive that the shells corresponded with description and samples. Is the verdict, however, a determination that the plaintiff fulfilled the conditions of the contract? Was there another duty upon the manufacturer to supply goods suitable for the consumer's needs?

The plaintiff contracted with the defendant to manufacture an article to be used for a particular purpose. It is not questioned that the celluloid shell was to be so formed that it would slip over

the metal disc and by reason of its shape and elastic qualities cling securely to the disc. In this respect the shell was to differ from those upon the market which were secured by folding back the edges of the celluloid over the disc. The finished product manufactured pursuant to the contract would not remain in place without the use of an adhesive. Neither did the shells remain uniform in size or retain the same degree of elasticity. A witness for the plaintiff testified that without the use of cement or some similar substance the disc and shell could not be held together " no more than a postage stamp on an envelope without the gum." It is uncontradicted that the application to the celluloid of any adhesive as yet discovered would result in discoloring, wrinkling and shrinking the shell. There is no dispute that celluloid reacts readily to heat and cold and either expands or contracts with atmospheric conditions. Age, measured sometimes by a few days, produces the same effect besides lessening its resiliency. Under these conditions perfect adjustments of the shells could not be made and cross-eyed dolls resulted. Although the jury determined that the article manufactured accorded with the description contained in the contract and conformed with the samples approved by the defendant, yet it is obvious that the article could not be used for the purpose contemplated by the parties.

Adopting for this case the language of Lord MACNAGHTEN in *Drummond & Sons* v. *Van Ingen & Co.* (L. R. 12 App. Cas. 284): " I venture to think that the case under review may well be decided on the broad principle that a manufacturer who agrees to supply goods to order, knowing the purpose for which they are required, thereby impliedly undertakes to supply goods fit for the purpose in view. The real question, as it seems to me, is whether there is anything in the special circumstances of this case to exclude or qualify that implied undertaking."

Prior to the execution of the agreement samples were submitted to the plaintiff with the inquiry could it " manufacture dolls' eyes that could work." The reply was, " If the samples will work our eyes will work." The plaintiff urges with persuasive argument that this conversation establishes the intention of the defendant to assume responsibility for the adaptibility of the article to the proposed use provided it conformed with the specifications of the contract and the samples submitted. The plaintiff insists that it produced exactly what the defendant wanted. This reasoning is not responsive to the circumstances of the case. The defendant had never been engaged in the handling or producing of celluloid and was unacquainted with its inherent characteristics. The plaintiff, through long experience as a manufacturer of celluloid

articles, was familiar with all the latent peculiarities of this material. As the proof attests, the plaintiff well knew the variable qualities of this product and its subtle inclination to change size, shape and color through contact with the atmosphere or with other substances. With this superior knowledge of the uncertain nature of celluloid, the plaintiff undertook to manufacture a shell which would fit over a metal disc and remain fast without the use of an adhesive. Never before had the plaintiff attempted to form dolls' eyes out of celluloid and the venture was an experiment. Yet this circumstance does not excuse the manufacturer. In matters exclusively within the province of the manufacturer, the buyer relies upon the manufacturer's skill and this principle gains added force when the manufacturer has special knowledge of inherent defects specious to the material involved. The offer to pr duce the shell suggested that a suitable article could be expected. If there were any doubts about it the plaintiff was in a better position to know than the defendant. The result demonstrated that the plaintiff undertook more than it could do. The completed shell did not fulfill the requirements of the contract and could not be used for the purpose intended.

Consent to manufacture the shell implied an obligation that the article would be suitable for the needs of the defendant, which were communicated to the plaintiff before the order was placed. The samples were a representation of the articles desired, but they did not comprehend the details of the process of manufacture or the fitness of the material for the proposed use. These features of production fell within the manufacturer's scope of information and constituted his guide in determining whether or not the article required could be produced from the material designated. The defendant wanted a shell which would function satisfactorily. If there were likelihood of a contrary result due to the character of the material employed, the manufacturer was chargeable with such knowledge. The belief of the defendant that a shell similar to the sample would " work " did not relieve the manufacturer of the responsibility of knowing that it could not " work " in the manner required. The defendant's only experience had been with metal eyes and plaintiff was fully apprised of this fact. The contract was consummated in reliance upon the plaintiff's skill and experience.

While the plaintiff and the defendant acted in good faith, and there is no indication of fraud present, a loss has been entailed and one of two innocent parties must suffer. The loss should fall upon the plaintiff because of failure to fulfill the contract. It has developed from the testimony that the article demanded by

the defendant cannot be produced to function properly, but the plaintiff had greater facility for ascertaining this information than the defendant. Being responsible for the loss by attempting to do more than it could accomplish, the plaintiff must suffer the penalty. Innocence of fraud or lack of good faith is not a circumstance which will relieve the plaintiff of liability. The broad principle prevails that the manufacturer was required to produce an article fit for the use in view. (*Drummond & Sons* v. *Van Ingen & Co.*, *supra*; *Howard Iron Works* v. *Buffalo Elevating Co., Nos. 1 & 2*, 113 App. Div. 562; affd., 188 N. Y. 619.)

The acceptance of an installment of the merchandise does not preclude the defendant from asserting that the undelivered balance is defective. (*Foster Co., Inc.*, v. *Fox*, 124 Misc. 740.) The retention of the goods received, without comment as to their defective condition, did not impose any liability upon the defendant to take the balance of the merchandise if it did not satisfy the requirements of the contract. This action may have been unfair but it neither constituted an acceptance of the undelivered merchandise nor a waiver of the right to reject it when delivery was tendered. This was an executory contract for the manufacture of merchandise and the burden was upon the plaintiff to show that the goods were in accordance with the terms of the contract. The cases cited by the plaintiff involve executed contracts and are of no assistance to it. These cases might have a bearing upon defendant's counterclaim to recover damages in respect to the 40,000 eyes paid for and retained by it.

The verdict of the jury should be set aside as contrary to the law and the facts.

Submit order.