**LEWIS et al. v. JACKSON & SQUIRE, Inc. et al.**

**LEWIS et al. v. F. S. NEELY CO., Inc. et al.**

**LEWIS et al. v. MIDWEST MINING CO.**

Nos. 817, 847, 857.

United States District Court
W. D. Arkansas, Fort Smith Division.

Sept. 15, 1949.

William L. P. Burke, Washington, D. C., Grant & Rose, Fort Smith, Ark., for plaintiffs.

No. 817:

Gutensohn & Ragon, Fort Smith, Ark., for defendant Jackson & Squire, Inc.

Warner & Warner, Fort Smith, Ark., for defendant R. L. Squire.

Harper, Harper & Young, Fort Smith, Ark., for defendant L. A. Jackson.

No. 847:

Warner & Warner, Fort Smith, Ark., (Lawrence S. Morgan, Fort Smith, Ark., on the brief), for defendants.

No. 857:

Gutensohn & Ragon, Fort Smith, Ark., for defendant.

JOHN E. MILLER, District Judge.

The complaint in Civil Action No. 817 was filed February 4, 1949, against Jackson & Squire, Inc., only.

The time of the defendant to plead was extended from time to time by the court upon the representation of the defendant that negotiations for a settlement were pending but said negotiations were unsuccessful and on April 27, 1949, the defendant filed a motion to dismiss to which motion the plaintiffs filed a response or answer on May 23, 1949.

On May 25, 1949, the plaintiffs filed a motion for summary judgment, but before filing the motion for a summary judgment the plaintiffs had filed a motion for judg-

356

ment by default and alleged that they were entitled to a judgment because of the failure of the defendant to file an answer. On May 26 the defendant filed a response or answer to the motion of the plaintiffs for a default judgment and also filed a response or answer to the plaintiffs motion for a summary judgment.

These motions came on for hearing on June 7, 1949, and at the conclusion of the oral argument on the motions by the respective attorneys the court granted the motion for a summary judgment in so far as the issue of liability was concerned, but did not pass upon the motion for judgment by default. The motion to dismiss filed by the defendant was overruled, and orders to this effect were entered at that time.

On the same date, June 7, 1949, the plaintiffs, after obtaining permission of the court to add L. A. Jackson and R. L. Squire as parties defendant, filed an amendment to their complaint in order to assert their claim against said Jackson and Squire as individuals as well as against the corporate defendant.

The defendants R. L. Squire and L. A. Jackson were served with summons and on July 7, 1949, the defendant R. L. Squire filed a motion to dismiss the complaint and the amendment thereto. Likewise on the same date the defendant L. A. Jackson filed a separate motion to dismiss the complaint and the amendment thereto. On the same date the corporate defendant, Jackson & Squire, Inc., filed a motion to vacate the summary judgment which the court had rendered against the corporate defendant on June 7, 1949.

The defendant R. L. Squire in accordance with local Rule 8 of this court filed simultaneously with the filing of his motion to dismiss a statement of points and authorities in support of his motion and his codefendant L. A. Jackson adopted the same in support of his motion to dismiss, as did the corporate defendant in support of its motion to vacate the summary judgment.

The plaintiffs have filed another motion for a summary judgment and the issues in this case are thus presented by this motion and the motions of the individual defendants to dismiss and the corporate defendant to set aside the summary judgment.

The allegations of the complaint and the amendment and the exhibits thereto must be accepted as true by the court in considering the motions to dismiss. The facts as reflected by the complaint, the amendment, and the exhibits may be summarized briefly as follows:

On May 21, 1946, the Secretary of the Interior, J. A. Krug, took possession of certain bituminous coal mines, including those of defendants, under an executive order issued by the President. Thereafter, on May 29, 1946, Krug entered into an agreement with John L. Lewis, President of the United Mine Workers of America, covering the terms and conditions of employment during Government possession. Contained in that agreement were provisions establishing a welfare and retirement fund from payments of 5¢ per ton of coal produced. The mines in question were being operated at that time by Jackson & Squire, a partnership comprising L. A. Jackson and R. L. Squire, and during the period of Government operation J. J. Anderson was designated as operating manager. During the period covered by the Krug-Lewis Agreement, May 29, 1946, to June 30, 1947, the partnership made payments but did not pay all that was due under the terms of that Agreement.

On June 30, 1947, the mines were returned to the private owners by order of the President, and on July 8, 1947, the partnership entered into the National Bituminous Coal Wage Agreement of 1947 with the United Mine Workers of America, which Agreement carried forward the welfare fund and raised the per ton payment from 5¢ to 10¢. This Agreement covered the period of July 1, 1947, to June 30, 1948, and during this period neither the partnership nor the corporate defendant paid into the fund the amount due under said Agreement. It should be noted here that on or about December 30, 1947, the corporate defendant was organized and all the goods, wares, property and business were turned over to it by the partnership, and the corporate defendant operated the mines for

the remainder of the period covered by the 1947 Agreement.

On June 25, 1948, the defendant corporation entered into the National Bituminous Coal Wage Agreement of 1948 with the United Mine Workers of America, which Agreement carried forward the Welfare and Retirement Fund and raised the per ton payment from 10¢ to 20¢. This Agreement covered the period of July 1, 1948, to June 30, 1949, and was in effect at the time the complaint was filed. During the period of July 1, 1948, to the date of the filing of the complaint, the defendant corporation did not pay into the fund the amount due under said Agreement.

The present trustees of the Welfare and Retirement Fund, the plaintiffs in this action, took over on July 21, 1948. Under the terms of the 1947 and 1948 Agreements the office of the trustees was filed by one representative of the Union, one representative of the Operators, and one selected by the other two. Under the Krug-Lewis Agreement, while the mines were operated by the Government, the Coal Mines Administrator was the trustee representing the Government, but upon the return of the mines to their owners, the operators named their own representative.

This suit is brought by the trustees now in office to collect the sums overdue and unpaid under the various Agreements, and jurisdiction is based upon diversity of citizenship and the requisite amount in controversy.

The complaint in Civil Action No. 847 was filed June 8, 1949, against F. S. Neely Co., Inc., and F. S. Neely, and the claim set forth therein is essentially the same as in Civil No. 817. Plaintiffs, trustees, are suing to recover overdue and unpaid payments under the 1947 and 1948 Agreements. On July 7, 1949, defendants filed a motion to dismiss, and adopted in support of said motion the statement filed in Civil Action No. 817 in support of the motion to dismiss filed therein by R. L. Squire. Thereafter, plaintiffs filed a motion for summary judgment.

In Civil No. 857 the complaint was filed on July 12, 1949, against Midwest Mining Corporation, but the correct name of defendant is Midwest Mining Company, a corporation. The claim in this case is essentially the same as in Civil No. 847. On July 26, 1949, defendant filed a motion to dismiss, and adopted in support of said motion the statement filed and adopted in support of the motions to dismiss pending in Civil Nos. 817 and 847. As in the other two cases, plaintiffs filed a motion for summary judgment.

The substantial identity of the questions raised in the three cases prompted the court to set them for briefing and oral argument together, and for the same reason the court now considers all three cases in a single opinion.

The parties to these cases have widely divergent views as to the true basis of plaintiffs' cause of action. Defendants contend that it has its basis in contract; that the plaintiffs' case must stand or fall upon the legality of the wage Agreements; and that the law of Arkansas governs the determination of the legality of the Agreements. Plaintiffs, on the other hand, contend that they are suing under an inter vivos charitable trust to reduce trust corpus to possession; that the trust, though established by contract, stands separate and apart from the Agreements, and is, therefore, valid regardless of the illegality of the Agreements; that this suit is essentially one by the trustees in the administration of the trust; and that the governing law is that of the situs of the trust, Washington, D. C.

Although the Welfare and Retirement Fund was originally established by the Krug-Lewis Agreement, it appeared for the first time in an agreement entered into by the Operators and the Union in the National Bituminous Coal Wage Agreement of 1947. The 1947 Agreement recognized that the Fund had been established by the Krug-Lewis Agreement, and obligations to the Fund for the coal produced under that Agreement were assumed by the Operators in the 1947 Agreement.

In view of the contention of the plaintiffs that an inter vivos trust was established, it is necessary to set forth and examine pertinent provisions of the 1947 Agreement dealing with the Welfare and

Retirement Fund. Those provisions are as follows:

"It is hereby stipulated and agreed by the contracting parties hereto that there is hereby created a Fund to be designated and known as the 'United Mine Workers of America Welfare and Retirement Fund.' During the life of this Agreement, there shall be paid into such Fund by each Operator signatory hereto the sum of ten cents (10¢) per ton of two thousand (2,000) pounds on each ton of coal produced for use or for sale. * * *

"It is agreed that this Fund is an irrevocable trust created pursuant to Section 302(c) of the 'Labor Management Relations Act, 1947' [29 U.S.C.A. § 186(c)], and shall endure as long as the purposes of its creation shall exist. * * *

"Subject to the stated purposes of this Fund, the Trustees shall have full authority, within the terms and provisions of the 'Labor Management Relations Act, 1947,' and other applicable law, with respect to questions of coverage and eligibility, priorities among classes of benefits, amounts of benefits, methods of providing or arranging for provisions for benefits, investment of trust funds, and all other related matters.

"Title to all the moneys paid into said Fund shall be vested in and remain exclusively in the Trustees of the Fund, and it is the intention of the parties hereto that said Fund shall constitute an irrevocable trust * * *.

"It shall be the duty of the Operators signatory hereto, and each of them, to keep said payments due said Fund, as hereinabove described and provided for, current and to furnish to the United Mine Workers of America and to the Trustees hereinabove designated a monthly statement showing the full amount due hereunder for all coal produced for use or for sale from each of the several individual mines owned or operated by the said Operators signatory hereto. Payments to said Fund shall be made by check payable to 'United Mine Workers of America Welfare and Retirement Fund' and shall be delivered or mailed to the office of said Fund located at 907 Fifteenth Street, N. W., Washington, D. C., or as otherwise designated by the Trustees. * * *

"Failure of any Operator signatory hereto to make full and prompt payments to the 'United Mine Workers of America Welfare and Retirement Fund' in the manner and on the dates herein provided shall, at the option of the United Mine Workers of America, be deemed a violation of this Agreement. This obligation of each Operator signatory hereto, which is several and not joint, to so pay such sums shall be a direct and continuing obligation of said Operator during the life of this Agreement and it shall be deemed a violation of the Agreement if any mine to which this Agreement is applicable shall be sold, leased, subleased, assigned, or otherwise disposed of for the purpose of avoiding the obligation hereunder. * * *"

The only change made by the 1948 Agreement was to increase the per ton payment from ten to twenty cents.

Plaintiffs contend that the above agreement established an inter vivos charitable trust, and rely upon the case of Van Horn v. Lewis et al., D.C.D.C., 79 F.Supp. 541, to support this contention. The Van Horn case, supra, was dealing with a problem of administration of the trust and necessarily involved only money that already had been paid into the Fund. It was not a suit, as these are, to recover for money never paid into the Fund, and for this reason the court is of the opinion that it is not in point, for it did not decide any question that is now before this court.

As the court understands plaintiff's contention, it is that the 1947 Agreement constituted "a transfer inter vivos by the owner of property to another person as trustee * * * for a third person." Certainly this is one method by which a trust may be created. Restatement of Trusts, 1935, Sec. 17(b). In this regard the 1947 Agreement says "there shall be paid into such Fund by each Operator signatory hereto the sum of * * *"; "it is agreed that this Fund is an irrevocable trust * * *"; and "title to all the moneys paid into said Fund shall be vested in and re-

main exclusively in the Trustees * *". While the language, "there shall be paid into such Fund", may have placed an obligation on the Operators to transfer money to the Fund (hereinafter discussed), it did not purport to transfer anything to the Fund at that time. In fact, the money was not even in existence at that time, nor was it definitely ascertainable, for it was impossible then to tell how much, if any, coal would be produced for use or for sale. On this point, the Restatement of Trusts, 1935, Sec. 76 provides: "The subject matter of a trust must be definite or definitely ascertainable from the facts existing at the time of the creation of the trust."

Comment c under Sec. 76 provides: "A trust cannot be created if the thing which would be the subject matter of the trust cannot be ascertained until a future time."

And, in Brainard v. Commissioner of Internal Revenue, 7 Cir., 91 F.2d 880, 881, the court said: "In the determination of the questions here raised it is necessary to consider the nature of the trust, if any, that is said to have been created by the circumstances hereinbefore recited. It is clear that the taxpayer, at the time of his declaration, had no property interest in 'profits in stock trading in 1928, if any,' because there were none in existence at that time. Indeed it is not disclosed that the declarer at that time owned any stock. It is obvious, therefore, that the taxpayer based his declaration of trust upon an interest which at that time had not come into existence and in which no one had a present interest. In the Restatement of the Law of Trusts, vol. 1, No. 75, it is said that an interest which has not come into existence or which has ceased to exist can not be held in trust."

■ If the language of the 1947 Agreement amounted to a manifestation of intention to create a trust at a subsequent time, a trust has not been created, even though the money came into existence, because there has been no transfer to the trustees. As stated in Restatement of Trusts, 1935, Sec. 26: "A manifestation of intention to create a trust inter vivos at some time subsequent to the time of manifestation does not create a trust."

And, in Comment a thereunder, it is stated: "If a person declares his intention or promises that he will at a subsequent time transfer property then owned or thereafter to be acquired by him to another person in trust, no trust arises unless and until he makes the transfer in trust."

■ The method of transfer set forth in the Agreement, "payments to said Fund shall be made by check payable to 'United Mine Workers of America Welfare and Retirement Fund', and shall be delivered or mailed to the office of said Fund * * * Washington, D. C.", has not been complied with, nor has there been a transfer or delivery, actual or constructive, by any method of the money herein sued for to the Fund, and it is important to note the distinction between the money actually paid in or transferred to the Fund, which was the situation in the Van Horn case, supra, and the money never paid in or transferred, which is the subject matter of these suits. In this regard, the court, in Straughan v. Tucker, 59 Ark. 93, 97, 26 S.W. 384, 385, stated: " 'Delivery, in this, as in every other, case, must be according to the nature of the thing. It must be an actual delivery, so far as the subject is capable of delivery. * * * If the thing be not capable of actual delivery, there must be some act equivalent to it. The donor must part not only with the possession, but with the dominion, of the property. * * *' 2 Kent, Com. (8th Ed.) 555, marg. p. 439."

And, it is important to remember that "intention, without acts, is of no effect." Smithwick v. Bank of Corning, 95 Ark. 463, 464, 130 S.W. 166, 167. See, also: McKey v. Paradise, 299 U.S. 119, 57 S.Ct. 124, 81 L.Ed. 75.

■ Therefore, it is the opinion of the court that no trust has arisen as to the money herein sued for, because it has never been transferred or delivered to the Fund, and if the plaintiffs have a cause of action it is based upon and depends upon the validity of the Agreements. This is true, even if the Agreements be treated as a promise to create a trust, for such a promise is enforcible only if the requirements of an enforcible contract are complied with.

As stated in Restatement of Trusts, 1935, Sec. 30: "A promise to create a trust in the future is enforceable, if, but only if, the requirements for an enforceable contract are complied with."

And, Comment b thereunder provides: "Whether a promise made by the owner of property to become trustee thereof in the future or to transfer the property in the future to another person in trust creates in the promisee a right to recover damages for breach of the promise is determined by the law governing contracts."

▉▉▉▉ Even though the plaintiffs are not suing as trustees under an executed trust, they have a standing as donee beneficiaries under the Agreements, and, in the opinion of the court, may maintain these suits as such. Defendants do not contend to the contrary, and although some of the earlier Arkansas cases hold that a donee beneficiary under a contract cannot maintain a suit to enforce the promise made for his benefit, the better view is to the contrary, and the language of the case of Freer v. J. G. Putnam Funeral Home, Inc., 195 Ark. 307, 111 S.W.2d 463, indicates that Arkansas will now allow such a suit. Restatement of Contracts, 1932, Secs. 133–136, representing the view which allows a donee beneficiary to sue, was cited with approval in the Freer case, supra.

▉▉▉▉ Proceeding then to a consideration of the Agreements, the first question confronting the court involves a determination of the governing law. Although there is a formal recital in the Agreements that they were executed in Washington, D. C., defendants contend that they were merely negotiated there, and that the final act necessary to place them in effect, the signing thereof by defendants, took place in Arkansas, with the result that they were actually made in Arkansas. Furthermore, defendants contend that the Agreements were to be performed in Arkansas in all substantial respects, and that, having been made and to be performed in this State, there is no choice of laws to be made, for no place other than Arkansas has any substantial connection with them. Assuming, however, that the Agreements were not made in Arkansas, it is undenied that they were to be performed here, and while the Arkansas Supreme Court has at times relied upon all three prevailing rules for determining the validity of contracts (place of making, place of performance and intention of the parties), the latest cases seem to favor the place of performance, it being noted that the choice resulted in the application of the Arkansas substantive law. Crown Central Petroleum Corp. v. Speer, Chancellor, 206 Ark. 216, 174 S.W.2d 547; Great Atlantic & Pacific Tea Co. v. Smith, D.C.W.D.Ark., 75 F.Supp. 156; Leflar, Conflict of Laws, Vol. 3, Ark.Law Review, page 18, 27. Therefore, under the undisputed facts of this case, the court is of the opinion that the Arkansas law governs in the determination of the validity of these Agreements, regardless of their place of making, for they were to be performed in Arkansas in all material respects. It might be noted in addition, that, as the court reads the Agreements, there is no manifestation of intention that the law of any other place govern.

The principal contention of defendants in support of their position that these Agreements are invalid and unenforcible under the Arkansas law, and the one upon which the court places its decision of the invalidity of the Agreements in Arkansas, is that each Agreement provides for a union shop, which provision is an essential part of the entire contract. The provision referred to reads as follows: "It is agreed that the United Mine Workers of America is recognized herein as the exclusive bargaining agency representing the employees of the parties of the first part (Operators). It is further agreed that as a condition of employment all employees shall be or become members of the United Mine Workers of America, except in those exempted classifications of employment as hereinafter provided in this Agreement."

Unquestionably, closed shop and union shop agreements are unlawful in Arkansas. Amendment No. 34 to the Constitution of the State of Arkansas; Ark.Stats. (1947) Secs. 81-201 to 81-204, both inclusive. Section 81-204 makes it a misdemeanor for one to enter into a contract calling for the maintenance of a closed shop or union

shop. And, recent decisions of the Supreme Court of the United States remove any doubt as to the constitutionality of the Arkansas law. Lincoln Federal Labor Union et al. v. Northwestern Iron and Metal Company, et al., 335 U.S. 525, 69 S.Ct. 251; A. F. of L. et al. v. American Sash and Door Company et al., 335 U.S. 538, 69 S. Ct. 258. Also, State laws prohibiting union security agreements do not conflict with the exclusive Federal Power under the commerce clause, Art. 1, § 8, cl. 3, even though interstate commerce be involved, for the Federal Government has not taken over the field. This is specifically provided for in the Labor Management Relations Act, 1947, Sec. 14(b), 29 U.S.C.A. § 164(b), and the Supreme Court has recently held that such was the case under the previous law, the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. Algoma Plywood and Veneer Company v. Wisconsin Employment Relations Board, 336 U.S. 301, 69 S.Ct. 584.

 Contracts for a union shop are illegal in Arkansas as being expressly prohibited by statute, Ark.Stats. (1947) sec. 81-203, and it is settled law in this State that recovery cannot be had upon illegal contracts. Bryant Lumber Company v. Fourche River Lumber Company, 124 Ark. 313, 187 S.W. 455; Carter v. Bradley County Road Improvement Districts 1 and 2, 155 Ark. 288, 246 S.W. 9; Ridge v. Miller, 185 Ark. 461, 47 S.W.2d 587. Therefore, these Agreements, in so far as the provision for a union shop is concerned, are invalid, and it is necessary to determine if this provision is separable from the other parts of the Agreements so that it may be discarded and the remainder enforced. In regard to this question, the Arkansas Supreme Court, in Bourland v. First Nat. Bank Bldg. Co., 152 Ark. 139, 149, 237 S. W. 681, 684, stated:

"It is well settled that if any part of the entire consideration for a promise or any part of an entire promise be illegal, whether by statute or by the Constitution or from considerations of public policy, the whole contract is void. * * *

"Where the lawful and unlawful parts of a contract cannot be separated so as to en-

force the one and annul the other, it is an indivisible contract and therefore null and void throughout."

Apparently the parties to the Agreements intended that the union shop provision as well as all other provisions be essential, for the Agreements themselves provide:

"This Agreement is an integrated Instrument and its respective provisions are interdependent * * *."

 Furthermore, it is apparent that the United Mine Workers of America would not have entered into the Agreements had the union shop clause not been inserted. This is manifested by the fact that the Union conducted a strike in support of its position that its Agreements contain a union shop clause, and in a recent case before the National Labor Relations Board, In the Matter of International Union, United Mine Workers of America, et al. and Jones & Laughlin Steel Corporation, et al., Case No. 5-CB-14, the Board found that the Union had violated Section 8(b) (2) of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 158(b) (2), by reason of conducting a strike in support of its contention that its Agreements include a union shop provision. This action of the Union conclusively demonstrates that the union shop provision was deemed absolutely essential. It follows, therefore, that the unlawful union shop provision, an essential and inseparable part of the Agreements, taints and renders unenforcible all parts of the Agreements, including, of course, the provisions relating to payments to the Welfare and Retirement Fund. Also, due to the public interest involved, the defendants may assert the defense of illegality of the Agreements even though they were parties thereto. Tate v. Gould, 175 Ark. 306, 309, 299 S.W. 24.

Defendants also contend that the Agreements are invalid under the Labor Management Relations Act of 1947, because the provisions of Sec. 8(a) (3) were not complied with prior to the insertion of the union shop provision in the Agreements. And, in this regard, the court is aware of the fact that the National Labor Relations Board, in the case before it referred to

above, entered a cease and desist order against the Union, its agents, and its president, because of the insertion of the union shop provision without first complying with Sec. 8(a) (3). As stated above the Board found a violation of Sec. 8(b) (2) by virtue of the strike conducted by the Union in support of its position on this matter. However, regardless of the merit of this contention, it appears that the effective date of the Labor Management Relations Act was August 22, 1947, subsequent to the execution date of the 1947 Agreement, and as the court reads the Act, it does not apply to agreements, of one year duration, executed prior to its effective date. Labor Management Relations Act, 1947, Secs. 102 and 104, 29 U.S.C.A. §§ 158, 151, 153 notes. Furthermore, while the court is advised, dehors the record, that the United Mine Workers of America have not complied with the Labor Management Relations Act, yet, the record before the court does not contain any proof of such noncompliance, and therefore, the court does not pass on this contention of the defendants. In any event, even if this contention of the defendants is correct, it would only invalidate the 1948 Agreement and not the 1947 Agreement, for the reasons set forth above.

Therefore, in Civil No. 817, an order should be entered sustaining the motion to vacate summary judgment filed by the defendant, Jackson & Squire, Inc.; overruling the motion for default judgment as against defendant, Jackson & Squire, Inc., which was not passed upon before because of the granting of the motion for summary judgment, and should now be overruled since the summary judgment is to be vacated; overruling the motion for summary judgment filed August 20, 1949, by the plaintiffs; sustaining the motions to dismiss filed by the defendants; and dismissing the complaint of the plaintiffs as to all defendants.

The complaint in this action should be dismissed as against the corporate defendant, Jackson & Squire, Inc., even though there has been no separate motion to dismiss filed by that defendant. Since it is the view of the court that the Agreements are illegal and unenforcible, the court is treating the motion to vacate summary judgment as including a motion to dismiss. This was the obvious intention of the defendant, Jackson & Squire, Inc., as evidenced by the language of the motion to vacate summary judgment, and the subsequent action of plaintiffs and defendants demonstrates that this was the understanding of all parties.

In Civil Nos. 847 and 857 an order should be entered overruling the motions for summary judgment filed by the plaintiffs; sustaining the motions to dismiss filed by the defendants; and dismissing the complaints of the plaintiffs.