John L. LEWIS, Josephine Roche and Henry G. Schmidt, as Trustees of the United Mine Workers of America Welfare and Retirement Fund of 1950, Plaintiffs,

v.

William T. HIXSON and Gordon Hixson, individually and trading as Hixson Coal Co., a partnership, Defendants.

John L. LEWIS, Josephine Roche and Henry G. Schmidt, as Trustees of the United Mine Workers of America Welfare and Retirement Fund of 1950, Plaintiffs,

v.

BOYD EXCELSIOR FUEL CO., Inc., a Corporation, Defendant.

John L. LEWIS, Josephine Roche and Henry G. Schmidt, as Trustees of the United Mine Workers of America Welfare and Retirement Fund of 1950, Plaintiffs,

v.

HIXSON COAL CO., Inc., a Corporation, Defendant.

John L. LEWIS, Josephine Roche and Henry G. Schmidt, as Trustees of the United Mine Workers of America Welfare and Retirement Fund of 1950, Plaintiffs,

v.

Ethel H. BLACKARD, Individually and Trading as the E. H. Blackard Coal Company, Defendant.

John L. LEWIS, Josephine Roche and Henry G. Schmidt, as Trustees of the United Mine Workers of America Welfare and Retirement Fund of 1950, Plaintiffs,

v.

JEWEL MINING COMPANY, Incorporated, a Corporation, Defendant.

Civ. A. Nos. 1410–1413, 1420.

United States District Court
W. D. Arkansas,
Fort Smith Division.

June 11, 1959.

Wood & Smith, Little Rock, Ark., Val J. Mitch, Harold H. Bacon, Washington, D. C., for plaintiffs.

Robert J. White, Russellville, Ark., Ray Blair, Paris, Ark., for defendants Wm. T. Hixson, Gordon Hixson and Hixson Coal Co.

Harper, Harper, Young & Durden, Fort Smith, Ark., for defendant Boyd Excelsior Fuel Co.

Mark E. Woolsey, Ozark, Ark., for defendant Ethel H. Blackard and E. H. Blackard Coal Co.

Luke Arnett, Little Rock, Ark., for defendant Jewel Mining Co.

JOHN E. MILLER, Chief Judge.

The plaintiffs in all of the cases are Trustees of the United Mine Workers of America Welfare and Retirement Fund of 1950.

The defendants are coal operators, and during all times material herein were engaged in the operation of various coal mines in the Western District of Arkansas.

The amount in controversy in each case exceeds the sum of $3,000, exclusive of interest and costs. All the actions were commenced prior to July 25, 1958.

Civil Action No. 1410 was filed March 22, 1958. The defendants are William T. Hixson and Gordon Hixson, d/b/a the Hixson Coal Company, a partnership, of Paris, Logan County, Arkansas. After the filing of several motions, now immaterial, the defendants on September 24, 1958, filed their answer.

Civil Action No. 1411 was filed March 22, 1958. The defendant, Boyd Excelsior Fuel Company, Inc., is a corporation organized and existing under and by virtue of the laws of the State of Delaware, and is engaged in the mining of coal in Sebastian County, Arkansas. Following the filing of several motions, now immaterial, the defendant on May 17, 1958, filed its motion for a summary judgment. Action on the motion was deferred until a trial on the merits, and on September 23, 1958, the defendant filed its answer.

Civil Action No. 1412 was filed March 22, 1958. The defendant is Hixson Coal Company, Inc., a corporation organized

and existing under the laws of the State of Arkansas, with its principal office located in Paris, Logan County, Arkansas. After the filing of various motions, now immaterial, the defendant on September 24, 1958, filed its answer.

Civil Action No. 1413 was filed April 1, 1958. The original defendants were Ethel H. Blackard and Bobby Blackard, an alleged partnership, doing business in Johnson County, Arkansas. After the filing of various motions, now immaterial, it was agreed by the parties that the defendant, Bobby Blackard, was not a proper party defendant, and therefore the complaint as to the original defendant, Bobby Blackard, was dismissed by order of the court on August 27, 1958. On September 29, 1958, the remaining defendant, Ethel H. Blackard, filed his answer, and at the conclusion of the trial on the merits, said defendant filed his motion for judgment on the ground that the plaintiffs had failed to prove that the defendant owes them any amount whatsoever.

Civil Action No. 1420 was filed April 18, 1958. The defendant, Jewel Mining Company, Inc., is a corporation organized and existing under the laws of the State of Arkansas, and is engaged in the operation of coal mines in Logan County, Arkansas. After several motions, now immaterial, were filed, the defendant on September 23, 1958, filed its answer.

By agreement of all parties the cases were consolidated for trial, and on March 26, 1959, were tried to the court. At the conclusion of the trial of the cases on their merits, they were submitted and taken under consideration, and the attorneys for the respective parties were requested to file briefs in support of their contentions. The briefs have been received and have been considered along with the pleadings and all the evidence, and the court now files this opinion in lieu of formal findings of fact and conclusions of law, separately stated.

The plaintiffs are citizens of Illinois, Colorado, and Ohio, respectively. The defendants are all citizens and residents of Arkansas except that the defendant in Civil Action No. 1411, Boyd Excelsior Fuel Co., Inc., is a citizen of the State of Delaware, and the defendant in Civil Action No. 1420, Jewel Mining Co., Inc., is a citizen of the State of Illinois.

The United Mine Workers of America Welfare and Retirement Fund of 1950 is a trust created by the National Bituminous Coal Wage Agreement of 1950, pursuant to Section 302(c) (5), Labor Management Relations Act, 1947, 29 U.S.C.A. § 186(c) (5).

On or about October 4, 1952, the defendants in Civil Action No. 1410, William T. Hixson and Gordon Hixson, partners, trading under the name of Hixson Coal Company, signed the National Bituminous Coal Wage Agreement of 1950, as amended September 29, 1952, effective October 1, 1952.

The defendant in Civil Action No. 1412, Hixson Coal Company, Inc., on August 30, 1954, signed the Agreement of 1950, as amended September 29, 1952, effective October 1, 1952; on September 10, 1955, signed the Agreement effective September 1, 1955; and on October 30, 1956, signed the Agreement effective October 1, 1956.

The defendant in Civil Action No. 1413, Ethel H. Blackard, trading as the E. H. Blackard Coal Company, on October 22, 1952, signed the Agreement effective October 1, 1952; on June 25, 1956, signed the Agreement effective September 1, 1955; and on October 17, 1956, signed the Agreement effective October 1, 1956.

The defendant in Civil Action No. 1411, Boyd Excelsior Fuel Company, Inc., on October 3, 1953, signed the Agreement effective October 1, 1952, and on August 29, 1955, signed the Agreement effective September 1, 1955.

The defendant in Civil Action No. 1420, Jewel Mining Company, Inc., on August 29, 1955, signed the Agreement effective September 1, 1955, and on October 1, 1956, signed the Agreement effective October 1, 1956.

It was stipulated that each and all of the defendants produced coal for use or

for sale during the periods set forth in the Agreements executed by them, with the resulting obligation due and owing the plaintiffs based upon a royalty of 40 cents per ton (should the National Bituminous Coal Wage Agreement of 1950, as amended, be held valid), as follows:

Hixson Coal Company, a partnership
Civil Action No. 1410

| Tonnage | Debt | Paid | Balance |
| --- | --- | --- | --- |
| 11,113.40 | $4,445.36 | None | $4,445.36 |

Boyd Excelsior Fuel Company, Inc.
Civil Action No. 1411

| Tonnage | Debt | Paid | Balance |
| --- | --- | --- | --- |
| 125,596.00 | $50,238.40 | $35,119.60 | $15,118.80 |

Hixson Coal Company, Inc.
Civil Action No. 1412

| Tonnage | Debt | Paid | Balance |
| --- | --- | --- | --- |
| 25,079.05 | $10,031.62 | $985.80 | $9,045.82 |

E. H. Blackard Coal Company
Civil Action No. 1413

| Tonnage | Debt | Paid | Balance |
| --- | --- | --- | --- |
| 33,668.36 | $13,467.34 | $6,186.60 | $7,280.74 |

Jewel Mining Company, Inc.
Civil Action No. 1420

| Tonnage | Debt | Paid | Balance |
| --- | --- | --- | --- |
| 28,811.00 | $11,524.40 | $5,226.07 | $6,298.33 |

(It was agreed that during the period from October 1, 1953, to June 30, 1956, inclusive, the defendant in Civil Action 1413, E. H. Blackard, d/b/a Blackard Coal Company, was not operating under contract with the United Mine Workers of America and that plaintiffs are making no demand of defendant for payments to the United Mine Workers of America Welfare and Retirement Fund of 1950 during that period. It was further agreed that the computations set forth above do not include figures for such period.)

The parties further stipulated:

"7. The National Bituminous Coal Wage Agreement of 1950 and the amendments thereto, which may be applicable to each of the defendants herein, were executed with the intention that they be performed in the State of Arkansas and, in fact, were performed in the State of Arkansas and the validity of said contract and the amendments thereto is to be construed under the laws of the State of Arkansas.

"8. While the National Bituminous Coal Wage Agreement of 1950 and the amendments thereto, for the purposes of these cases, are to be construed under the laws of the State of Arkansas, said contract and the amendments thereto are the same

246

as are entered into between the United Mine Workers of America and other various bituminous coal operators throughout the many states in the United States where bituminous coal is produced.

"9. Though plaintiffs do not concede it to be material, it is admitted that John L. Lewis is President of the United Mine Workers of America and has held that office during the periods involved in each of these cases.

"10. The area in which the defendants operate mines is a part of District 21 of the United Mine Workers of America.

"11. By reason of the above stipulated facts no party may submit evidence which contradicts any facts stipulated and agreed to as set forth above. However, any party may submit competent evidence as to any other subject matter not contained in this stipulation and relevant and material to the issues of the litigation involved."

The Wage Agreement of 1950, hereafter referred to as the contract, was executed by the United Mine Workers of America and at the times mentioned above, by the various defendant coal operators or their association. Among other things, the contract created a trust fund which was to be used for various types of welfare payments to miners employed by signatories to the contract. The fund was to be supplied by the royalty payments of 40 cents per ton of mined coal, and it is these royalties which are in issue here. The contract also appointed trustees, who are the plaintiffs, and vested title to payments and obligations under the contract in them.

1.

 Each of the cases is identical as to the defense that the contract is invalid on the ground that it is contrary to the public policy of the State of Arkansas and the Constitution and statutes of

Arkansas. This contention stems from the italicized portion of the following provision of the contract:

"It is agreed that this contract is for the exclusive joint use and benefit of the contracting parties, as defined and set forth in this Agreement. It is agreed that the United Mine Workers of America is recognized herein as the exclusive bargaining agency representing the employees of the parties of the first part. *It is further agreed that as a condition of employment all employees shall be, or become, members of the United Mine Workers of America, to the extent and in the manner permitted by law,* except in those exempted classifications of employment as hereinafter provided in this agreement."

There is little dispute about the facts involved. The common defense to the plaintiffs' claims for royalties under the contract is the assertion that the entire contract sued upon is void and unenforceable because the above-quoted language calls for a union shop in violation of Amendment 34 to the Constitution of Arkansas and the statutes enacted pursuant thereto. Ark.Stat.Ann., Secs. 81–201 to 81–204.

Sec. 81–201 provides:

"Freedom of organized labor to bargain collectively, and freedom of unorganized labor to bargain individually is declared to be the public policy of the State under Amendment No. 34 to the Constitution."

Following the language of Amendment No. 34, Sec. 81–202 provides:

"No person shall be denied employment because of membership in, or affiliation with, a labor union; nor shall any person be denied employment because of failure or refusal to join or affiliate with a labor union; nor shall any person, unless he shall voluntarily consent in writing to do so, be compelled to pay dues, or any other monetary

consideration to any labor organization as a prerequisite to, or condition of, or continuance of, employment."

Contracts in violation of the above section are prohibited by Sec. 81–203 as follows:

"No person, group of persons, firm, corporation, association, or labor organization shall enter into any contract to exclude from employment, (1) persons who are members of, or affiliated with, a labor union; (2) persons who are not members of, or who fail or refuse to join, or affiliate with, a labor union; and (3) persons who, having joined a labor union, have resigned their membership therein or have been discharged, expelled, or excluded therefrom."

Prior to the Wage Agreement of 1950 the contract between the Union and the operators was substantially similar to that sued upon here except that it required membership in the Union as a condition of employment, and the saving clause "to the extent and in the manner permitted by law" was not a part of that contract. Thus, prior to the insertion of the saving clause, the contract unquestionably called for a union shop, and thus violated the above-quoted statutes and their constitutional basis. Accordingly, the entire contract was held illegal and unenforceable in a suit to collect royalties provided for therein. Lewis v. Jackson & Squire, D.C.W.D.Ark.1949, 86 F.Supp. 354. It is the defendants' contention herein that the insertion of the saving clause does not effectively change the contract's requirement of a union shop, but that, on the contrary, the contract here, notwithstanding the saving clause, specifically commands that all employees of the coal operators be or become union members as a condition of employment. They argue that if this is not true as a matter of law, the saving clause at least creates an ambiguity and therefore extrinsic evidence, including the "practical construction" given to the contract by the parties, may be introduced to show the true meaning thereof.

The defendants' contention that the contract requires a union shop even after the insertion of the saving clause cannot be sustained. On its face the saving clause says in effect that membership in the Union as a condition of employment shall not be required except as permitted by law. The law of Arkansas does not permit the coercion of union membership as a condition of employment, and therefore by its own terms the contract makes no such requirement.

But the defendants argue that at the very least the saving clause is ambiguous, and extrinsic evidence, which they offer, should be considered in interpreting the contract. To support this contention they attempt to draw two possible meanings from the union security provision. It might mean, they concede in this argument, that the "condition of employment" does not apply except to the extent that applicable law permits such a condition of employment. The defendants are insistent, however, that by reason of the particular juxtaposition of the saving clause, it means, or could be interpreted to mean, that as a condition of employment all employees shall be or become union members, and the obligation to join the Union is limited only to the extent that the law forbids union membership. In other words, the defendants contend that the saving clause does not limit the "condition of employment," but only has the effect of saying that every mine employee must be a member of the union unless state law forbids his membership. Since state law does not and could not forbid union membership, the defendants say that the union security clause therefore requires as a condition of employment total union membership of all employees in the mines, thus violating the so-called freedom-to-work statutes. This argument is stated variously by different defendants, but the above recapitulates its general terms.

Among its other deficiencies, this position fails to consider the phrase in the

saving clause which requires union membership only "in the manner permitted by law." Assuming that the defendants' argument is correct so far as it goes, it is nevertheless clear that union membership is required only in the *manner* permitted by law. The law does not permit the obtention of union members by contractual obligation between the Union and the mine operators. Since this manner of obtaining or requiring union membership is not permitted, the saving clause, in requiring union membership only in the *manner* permitted by law must mean, if anything, that where freedom-to-work statutes are applicable, the union security clause is not to be given effect. Employees, according to the union security clause, must be union members "to the extent" permitted by law, which, since law permits total union membership, would require all employees to be union members. But the saving clause goes further and specifies that union membership is required only in the "manner" permitted by law. In making this provision the saving clause expressly negates the possibility of a contractual union shop.

In a similar dispute involving the same contract under similar "freedom-to-work" laws in Tennessee, the same result has been reached. In Lewis v. Fentress Coal and Coke Company, D.C.Md.Tenn. 1958, 160 F.Supp. 221, at page 225, the court said:

> "The effect of the savings clause would appear to be to eliminate from the contract altogether the union security provision in any state in which the Agreement was to be performed and having a statute outlawing such a provision. It would have practically the same effect as if the parties had provided in express terms that the provision for union membership as a condition of employment should not apply in any state where such provision was unlawful. Any other conclusion would do violence to the clearly expressed intention of the parties."

This decision was affirmed per curiam in Fentress Coal & Coke Company v. Lewis, 6 Cir., 1959, 264 F.2d 134.

The court is of the opinion that there is no ambiguity in the saving clause to the union security provision. It clearly had one purpose—to render the contract valid in states having the freedom-to-work clause.

### 2.

■ Of course, if the contract in question were ambiguous or "doubtful," extrinsic evidence, particularly evidence which would indicate the contemporaneous understanding of the parties, would be admissible as an aid in the construction of the disputed terms. See Hurst v. Flippin School District No. 26, Ark. 1958, 312 S.W.2d 915; Hall v. Weeks, 1949, 214 Ark. 703, 217 S.W.2d 828; Magness v. Madden, 1948, 212 Ark. 646, 207 S.W.2d 714; Lutterloh v. Patterson, 1947, 211 Ark. 814, 202 S.W.2d 767; Western Auto Supply Co. v. Sullivan, 8 Cir., 1954, 210 F.2d 36. Even if the saving clause were ambiguous, however, the extrinsic evidence offered by the defendants does not support the interpretation which they claim.

The evidence offered by the defendants. in general shows continual and concerted efforts on the part of various mine workers and Union officials to obtain as many union member employees as possible. Some of the acts of the Union officials and mine workers are characterized by at least one of the defendants. as illegal, and all of the defendants insist that the acts of the Union to obtain full union membership show a contemporaneous construction by the parties of the union security clause to the effect that. a union shop is required.

The evidence covers a wide range of activities, and much of it is probably inadmissible.

■ There is no evidence specifically on behalf of the defendants in Civil Action No. 1420 or Civil Action No. 1413. to support this particular contention. In. Civil Action No. 1411 the defendant,.

Boyd Excelsior Fuel Co., Inc., is substantially owned by Mr. Degen Boyd, who testified that he and other mine owners concluded in the initial periods of this contract that a union shop was called for. It goes without saying that this is merely a private opinion which cannot be determinative here. It is asserted that from Mr. Boyd's experience in the coal mining business he knew, "as certainly as he knew the sun would rise," that the intent of the Union was to require a union shop. This, of course, is not evidence which the court may consider. The court might take judicial notice that it is the general practice of unions to provide for as much union security as possible, but the court cannot take judicial notice of the specific intent of the Union in this case when such intent is not expressed.

The main incident upon which the defendant Boyd relies grows out of his intention to employ his son, Robert, during one summer in his mines. The local union upon learning this fact advised Mr. Boyd that his son would have to become a union member. Notwithstanding his prior conclusion that a union shop was called for by the contract, Mr. Boyd resisted this demand by the Union. However, he was advised that the men in the mines would not work alongside a nonunion member, and that if Mr. Boyd's son were employed without becoming a union member, the mine would have to be shut down. The defendant Boyd, therefore, contends that such action amounted to a determination by the parties that a union shop was called for by the contract. The plaintiffs contend that the local union had no authority to modify the contract or interpret it by its action. See United Construction Workers v. Haislip Baking Co., 4 Cir., 1955, 223 F.2d 872; Garmeada Coal Co. v. International Union, 6 Cir., 1956, 230 F.2d 945. It is not necessary, however, to reach the plaintiffs' contentions on this point because proof that union members, even assuming their authority, attempted to force a virtual union shop is not evidence that they did so in reliance upon the contract. The testimony is not that

the local union insisted upon any alleged contractual rights to a union shop. On the contrary, the testimony merely shows a threat by the miners to engage in an independent action designed to enforce a union shop. A strike for that purpose would be illegal, and picketing or other overt acts in connection therewith could be enjoined. Self v. Taylor, 1951, 217 Ark. 953, 235 S.W.2d 45. But although such a strike might subject the Union or even individual employees to an action for damages, cf. Lion Oil Company v. Marsh, 1952, 220 Ark. 678, 249 S.W.2d 569, the employees, of course, could not be compelled to work. The exercise or the threatened exercise of their right not to work can hardly be equated with an interpretation of the contract.

With respect to the defendants in Civil Actions Nos. 1410 and 1412, hereafter referred to as the Hixsons, a number of other activities are shown to have taken place, and the same contention is made on behalf of these defendants, that is, that the union activities demonstrate a practical construction of the contract by the parties, which construction would require a union shop. In the case of the Hixsons, the primary argument relates to actual work stoppage and slow-downs. It is undisputed that the Hixsons' employees did stop work, and on another occasion worked only a three-day week, but the record also reflects that the work stoppage was at least on its face a refusal to work until the Hixsons had signed the contract here sued upon. In other words, the employees in the Hixsons' mines refused to work without a written contract. The defendants in this case argue that the reason for such work refusals was that if the union men worked the mine when no contract existed between the mine owner and the Union, the men would lose their union cards, hospital, burial, sickness and pension benefits under the trust involved here. Apparently a field representative of the Union had so advised the Hixsons' employees, and when the contract with Hixsons terminated and Hixsons refused to sign a new contract, their employees refused to work.

It is apparent that if the coal operator was not a signatory to the contract here involved, or a least to some similar contract, the employees would not receive the benefits of the royalty payments called for in those contracts. It is difficult, however, to follow the reasoning urged by the defendants Hixsons that this work refusal by their employees was in effect a construction of the contract "as a means of coercing union membership among the mines." It appears that the Hixsons were the recipients of an extraordinarily large share of industrial trouble. Apparently one of the Hixsons offered in good faith to work a certain coal lease cooperatively with the employees but without a contract. Although the individual employees were in favor of such work, appropriate Union officials objected to it, and perhaps in connection with that objection, a suit was instituted against the Hixsons for alleged vacation pay. Probably to coerce the Hixsons to sign the contract, Mr. Dave Fowler, a Union official for District 21 of the United Mine Workers, advised one of the Hixsons that the Union could keep the Hixsons involved in expensive litigation as long as necessary, that it was a case of big business, i. e., the Union, fighting little business, i. e., the employer. The use of legal process in such a manner is obnoxious to anyone familiar with our legal institutions, but again these facts, far from showing a construction of the contract, demonstrate only the efforts on behalf of the Union and the mine employees to obtain their desires outside of the contract. Indeed, most of the activities involved, such as the demand that a contract be signed, do not even relate to the union security provision. In the case of the Hixsons they relate solely to the efforts on the part of the Union and the mine employees to have the contract signed. In fact, Mr. W. T. Hixson testified at the hearing that at various times following the execution of the 1950 contract and the amendments thereto, there were as many as five non-union employees in his mines. This seems to demonstrate rather conclusively that the contract was not interpreted as requiring a union shop.

The activities of the mine employees in procuring new members for their Union as they became employees was certainly neither illegal nor a practical construction of the union security clause of this contract. To the extent that strikes were threatened to coerce a union shop, such activities were illegal under the statutes of Arkansas, but they did not reflect an insistence by the employees upon *contractual* rights. Likewise, a *work stoppage or strike designed to compel an employer to sign a written contract* cannot reflect an interpretation of that contract. If, of course, the contract for which the employees were striking is illegal, then the strike itself would be illegal, but that, of course, merely begs the question before the court. The evidence at best indicates that the Union and/or mine employees worked independently of the contract for conditions which approximated a union shop.

This precise question was considered in Lewis v. Fentress Coal and Coke Company, supra, where the court said at page 227 of 160 F.Supp.:

"In the defendant's answer it is alleged that 'in the performance of said contract, the defendant was required by the plaintiffs to employ * * * only persons who were or became members of the United Mine Workers of America and to check membership dues off the wages of all its employees in Tennessee and to remit same to the United Mine Workers.' The defendant insists that such conduct violates the Tennessee right-to-work statute and hence that the plaintiffs cannot recover in the action. In any event it is argued that the practice should be looked to as indicating the practical construction of the contract by the parties as requiring a union shop. The allegation in the answer must be accepted as true for the purpose of disposing of the defendant's contention, but even accepting its correctness, it does not follow that the plain-

tiffs' motion for summary judgment should be overruled or that a material issue of fact is presented. This is true because at most the practice, not authorized by the contract itself, would show that the union and the company violated the applicable law."

If, as the coal operators assert here, the activities of the mine workers were illegal, the remedy of the defendants in this case may be by injunction or an action for damages, or by their own concerted economic pressure. In any event, their remedy is not the breach of this contract, which both on its face and in the light of all the evidence which has been adduced to "interpret" it is valid.

### 3.

■ The defendants Hixsons and Jewel Mining Company in their brief also contend that the contract is unenforceable for the additional reason that it requires discrimination between union and nonunion employees of the defendants. The defendants are correct, of course, in asserting that no such discrimination is permitted. It seems probable that the terms of the Labor Management Relations Act, 29 U.S.C.A. § 158, would prohibit any agreement which would place one group of employees in a more favorable class than another group with respect to welfare benefits. Basing their contentions upon this premise, the defendants Hixsons and Jewel assert that under the trust created by the contract sued upon here discrimination is made between union and nonunion members as to the welfare benefits. The defendants, therefore, argue that the contract creating the trust is invalid and unenforceable, at least insofar as it requires the employer to make payments into such trust fund, since the employer has no power to contract for benefits which are not equally applicable to all employees. Were this argument supported by any proof, its force might be determinative. However, the proof upon which the defendants rely establishes only that the welfare benefits derived from the trust

fund would not be available to miners employed by a coal operator who is not a signatory to the contract. The requirements for eligibility for benefits in the United Mine Workers of America Welfare and Retirement Fund of 1950 are:

*Pension*—A miner must have:

1. Attained the age of 60 years or over at the time of the application for pension.

2. Completed 20 years' service in the coal industry in a job classified in any National Bituminous Coal Wage Agreement within the 30-year period immediately preceding application for pension.

3. Retired from or ceased work in the bituminous coal industry after May 28, 1946, following regular employment in a classified job and was regularly employed in a classified job in the bituminous coal industry immediately preceding May 29, 1946.

"Benefit: Payment of $100.00 per month to all pensioners whose applications have been approved beginning in the first month after authorization for pension.

*"Hospital and Medical Care*

"(1) Miners and relatives of miners and (2) widows and relatives of deceased miners, providing that the miner at the time of request for hospital and medical care; or the deceased miner who died after May 28, 1946, at the time of death; were either:

(a) Working in the coal industry in a classified job.

(b) Receiving retirement pension from the Fund and not employed outside the coal industry.

(c) Unemployed and whose last employment was in the coal industry in a classified job subsequent to May 28, 1946.

"Benefit: Funeral Expense Benefit not to exceed $350.-00. Widows and Survivors Benefit of $650.-00 payable in 12 monthly installments, the first 11 of which shall be $50.00 each and the last shall be $100.00.

"*Disaster Benefit*

"1. Provides for payment of benefits in the case of a disaster to miners and to widows and children and other dependent relatives of a deceased miner at the discretion of the Director, not to exceed $500.00 for each person, and providing that not more than $2,000.00 shall be paid to any one family as a disaster benefit, providing the miner or the deceased miner was at the time of the disaster:

(a) Working in the coal industry in a classified job.

(b) Receiving retirement pension from the Fund and not employed outside the coal industry.

(c) Unemployed and whose last employment was in the coal industry in a classified job subsequent to May 28, 1946.

"Neither membership in nor the payment of dues to the United Mine Workers of America is a prerequisite or requirement of eligibility for the receipt of benefits of the United Mine Workers of America Welfare and Retirement Fund of 1950."

It may be true that the national policy of United Mine Workers requires a forfeiture of membership therein on the part of any member who works in a nonunion mine. That, however, is a matter between the Union and the individual member. There is nothing to indicate that a union member who so forfeits his membership becomes ineligible for the benefits of the trust fund so long as he continues to work either as a union member or a nonunion member for a coal operator who is signatory to the contract.

Mr. David Davies, an officer in United Mine Workers, appears to have advised some of the Hixsons' employees, and perhaps others, that union membership would be forfeited if union members worked in a nonunion mine, and further that benefits from the trust fund would not be available to those working for a coal operator who was not signatory to the contract. As pointed out above, none of this indicates any discrimination between union and nonunion employees. Some of Mr. Davies' language in his advice to union members might conceivably be construed as telling those employees that trust fund benefits would be cut off if union members worked alongside nonunion members. In the first place, the court is doubtful whether Mr. Davies' statements can be so construed. Even if they were, however, those statements are mere conclusions of law, and there is no proof which purports to show that the trust fund was either obligated to or did administer its benefits in a discriminatory manner. At most, Mr. Davies' statements if construed in the manner suggested by the defendants show a fraudulent inducement to union members to retain their union membership and to cease work for the Hixsons. The proof in nowise indicates any discrimination in the administration of the trust. Therefore, the contention of the defendants Hixsons and Jewel that the contract is unenforceable because it requires discrimination cannot be sustained.

4.

The defendant in Civil Action No. 1413, hereinafter referred to as Blackard, contends that the plaintiff trustees have no cause of action, and argues in

support of that contention that the plaintiffs were not parties to the contract here sued upon. He recognizes the usual rule that a third-party beneficiary may ordinarily enforce an otherwise valid contract, but says that the Wage Agreement of 1950 specifically excludes that possibility here. The contract provides in part: "It is agreed that this contract is for the exclusive joint use and benefit of the contracting parties, as defined and set forth in this Agreement." The defendant Blackard, therefore, reasons that only the parties themselves could enforce any obligations which might exist under the contract.

While on the one hand the contract specifies that it is for the "exclusive joint use and benefit" of the contracting parties, on the other it clearly vests title to all monies paid or *due* the trust in the trustees. It likewise provides that the payments for the welfare trust shall not be construed as wages. Thus neither the union nor the employees as individuals could enforce these obligations.[1]

Construing the same contract now before the court in a slightly different context, the court in Lewis v. Quality Coal Corporation, 7 Cir., 1957, 243 F.2d 769, at page 771, said:

> "They [the trustees] and they alone have the right to maintain suits to recover that which the operators agreed to pay them."

By the same token, the Union is not a necessary party. The court said at page 772:

> "Defendant urges also that United Mine Workers of America, having signed the contract, is a necessary party, but the record discloses that the UMWA has no title to the money in the fund, or right to recover same. It is in no way interested therein, except to see that the trustees perform their trust duties. The Act has been so interpreted in United Marine Division, I. L. A., Local 333, A. F. of L. v. Essex Transportation Co., 3 Cir., 216 F.2d 410, 412. No person is legally interested in this controversy except plaintiffs, who, as trustees, claim the right to recover, and defendant who has agreed to pay the royalties demanded."

The provision that the contract is for the "exclusive joint use and benefit" of the contracting parties may not necessarily mean that they and only they could *enforce* the contractual provisions. In any event, it is a general term and its requirements are not spelled out. As in statutory construction, the general requirement must fall to the specific. The rights of the trustees are specifically spelled out. They have the sole title to the funds claimed. No one else could enforce the contractual obligations of the coal operators. If there is a conflict between these specific rights of the trustees to the funds in question and the general provision of the contract that it is for the exclusive use of the parties, the specific provisions are controlling. In Restatement, Contracts, Sec. 236(c), the rule is thus stated:

> "(c) Where there is an inconsistency between general provisions and specific provisions, the specific provisions ordinarily qualify the meaning of the general provisions."

Furthermore, it is obvious that if the trustees, who have title to the obligations owing to the trust, cannot enforce these obligations, then no one can. A construction that the trustees may not enforce the contract would be a construction that it is a nullity at least so far as the welfare provisions are concerned. In McCargo v. Steele, D.C.W.D.Ark.1958, 160 F.Supp. 7, this court, in an opinion by the Honorable Harry J. Lemley, said at page 15:

> "And in that connection it is to be kept in mind that when parties

---

1. Similarly, these obligations cannot be enforced as "wages" to obtain the wage priority under the Bankruptcy Act, 11 U.S.C.A. § 104. United States v. Embassy Restaurant, Inc., 1959, 359 U.S. 29, 79 S.Ct. 554, 3 L.Ed.2d 601.

enter into a solemn contract, there is no presumption that they intend to effect a nullity; in fact the presumption is the other way; and their agreement should not be nullified by one characterization of the instrument expressing the same, if such result can reasonably be avoided by another. 12 Am.Jur. 'Contracts,' Section 251; 17 C.J.S. Contracts, § 318, pp. 735–736; Gauss Sons v. Orr & Lindsey, 46 Ark. 129; Hastings Industrial Co. v. Copeland, 114 Ark. 415, 169 S.W. 1185; see also Boehmer Coal Co. v. Burton Coal Co., 8 Cir., 2 F.2d 526, 528."

Related rules, standard to contractual interpretation, force the same result. See generally, Restatement, Contracts, Secs. 235–236. The court does not believe that the parties intended to produce a nullity. The creation of the trust was intended to provide welfare benefits for miners, and assuredly it was intended that the trustees were of necessity given the power to collect obligations due the trust. See Sacramento Nav. Co. v. Salz, 1927, 273 U.S. 326, 329, 47 S.Ct. 368, 71 L.Ed. 663.

This court in Lewis v. Jackson & Squire, supra, specifically passed upon the question, and held that the trustees were proper parties plaintiff as donee beneficiaries under the contract. Notwithstanding the general language of the contract that the Agreement was for the "exclusive" benefit of the parties thereto, the specific rights afforded the trustees are compelling pointers to the conclusion that they and they alone may and must enforce the obligations to the trust.

The defendant Blackard also asserts the related argument that the Union, not the trustees, had the option to treat a failure to make the payments called for in the contract as a violation thereof. In that respect, the contract provides:

"Failure of any Operator signatory hereto to make full and prompt payments to the 'United Mine Workers of America Welfare and Retirement Fund of 1950' in the manner and on the dates herein provided shall, at the option of the United Mine Workers of America, be deemed a violation of this Agreement."

The defendant Blackard contends that if the United Mine Workers failed to exercise the option, they have waived the right of the trustees to claim the payments due to the trust and that the option was not exercised here. Thus says Blackard, the trustees can have no right to claim the obligations due under the 1950 contract. The language relied upon to sustain this contention, however, merely means that the United Mine Workers may treat a failure to make payments to the trust fund as a violation or breach of the entire contract, thus justifying a rescission and releasing the United Mine Workers from the obligations and limitations imposed upon them by the contract. The "violation clause" assuredly does not mean that a failure to comply with the terms of the contract is not really a breach until so pronounced by the Union. The provision in the contract that the trust is irrevocable demonstrates that the rights of the trustees cannot be manipulated either by the Union or by the coal operators.

It would be naive to assert that the Union and its officials in the affairs which have been shown in the evidence have in each instance acted with the responsibility and good faith that should be concomitant to the exercise of such formidable power. It would be equally naive to insist that the employers at all times have an adequate remedy for the illegal or threatened illegal acts of the Union or its members. But these are matters which cannot be remedied by allowing the defendants to evade or ignore their contractual obligations. The defendants must recognize the right of the Union and individual employees, whether union members or not, to refuse to work. If, by such refusal, the union members can coerce the coal operators into a violation of the freedom-to-work statutes, then the most that can be said, as was noted in the Fentress case, is

that both parties have violated the law. But such violation is not demonstrative of a construction of the contract itself. There has been no discrimination shown in the administration of the trust fund, and the trustees having sole title to the trust properties and the obligations due it are proper parties plaintiff here.

The plaintiffs are, therefore, entitled to judgments in the stipulated amounts against the several defendants.

An order in accordance herewith is being entered today.